## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| B.Y.C.C. on behalf of herself and on behalf of her minor child, M.S.C.C., | Hon. Michael A. Shipp, U.S.D.J. |
| J.A.L.C. on behalf of himself and on behalf of his minor child, L.L.G., | |
| R.J.P. on behalf of himself and on behalf of his minor child, O.R.J.J., | Civil Action Nos. 22-06586 (MAS) (DEA) |
| | 22-06587 (MAS) (DEA) |
| | 22-06588 (MAS) (DEA) |
| Plaintiffs, | |
| v. | **Return Date: June 5, 2023** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS
## UNDER RULES 12(b)(1) AND 12(b)(6)
## OF THE FEDERAL RULES OF CIVIL PROCEDURE

---

Natalie J. Kraner
(nkraner@lowenstein.com)
Stephanie Ashley
(sashley@lowenstein.com)
Logan Vickery
(lvickery@lowenstein.com)

Catherine Weiss
(cweiss@lowenstein.com)
Michelle L. Goldman
(mgoldman@lowenstein.com)
Amanda Sewanan
(asewanan@lowenstein.com)
Pati Candelario
(pcandelario@lowenstein.com)

Jennifer Fiorica Delgado
(jdelgado@lowenstein.com)
Wayne Fang
(wfang@lowenstein.com)
Markiana J. Julceus
(mjulceus@lowenstein.com)
Raymond S. Cooper
(rcooper@lowenstein.com)

**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973-597-2500

*Pro Bono Counsel for Plaintiffs*                    May 2, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iv

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS .......................................................................... 5

I.      Conception, Launch, and Execution of the Family Separation Policy.............. 5

    A.      The Launch of the Family Separation Policy............................ 6

        1.      The El Paso Sector Pilot .................................. 6

        2.      Expansion to the Whole Southern Border .................... 9

    B.      Family Separation as the Chief Deterrent........................... 12

    C.      Bias Against Central American Families............................ 16

    D.      Cruel and Chaotic Implementation ................................ 18

II.     Separating Plaintiff Parents and Children ..................................... 22

    A.      Beatriz and Manuel............................................... 22

    B.      Jacob and Leya .................................................. 26

    C.      Rafael and Orlan ................................................ 30

ARGUMENT ...................................................................................... 35

I.      This Court Has Jurisdiction. ................................................. 35

    A.      Standard of Review .............................................. 35

    B.      The Discretionary Function Exception Does Not Shield the
        Government from Liability for Forcibly Separating Plaintiffs............. 35

        1.      The Complaints adequately allege violations of the Due
            Process and Equal Protection Clauses of the Federal
            Constitution. ........................................... 36

            a.      The Due Process Clause overrides the
                Government's discretion. ................................ 37

            b.      The Equal Protection Clause overrides the
                Government's discretion. ................................ 40

            c.      Plaintiffs are not required to plead that the
                constitutional violation was clearly established............. 42

        2.      The federal definition of an "unaccompanied alien child"
            overrides the Government's discretion. ....................... 45

3.      The *Flores* Settlement Agreement overrides the Government's discretion. ............................................ 48

4.      DHS rules and internal agency standards override the Government's discretion. ..................................... 52

C.      The Due Care Exception Does Not Apply. ............................................. 56

D.      Plaintiffs' Claims Have Private-Person Analogs. ................................. 59

E.      Defendant's Other Jurisdictional Challenges Also Fail. ...................... 62

1.      The Complaints plead common law torts, not "constitutional torts." ................................................. 62

2.      The Complaints plead common law torts based on the misconduct of federal employees, not "systemic torts.".............. 64

3.      The independent contractor exception does not bar Plaintiffs' claims. .......................................... 66

II.     Plaintiffs Have Adequately Pled Claims Upon Which Relief Can Be Granted................................................................. 68

A.      Standard of Review. ................................................... 68

B.      The Allegations in the BYCC and RJP Complaints Support Liability Under Texas Law. ......................................... 69

1.      Texas privileges are inapplicable to Plaintiffs' state tort law claims. .......................................... 69

2.      The allegations support each of the Texas torts pled. .............. 73

a.      Intentional infliction of emotional distress..................... 73

b.      Negligence, negligent undertaking, and breach of fiduciary duty ......................................... 76

i.      Defendant owed a duty to Plaintiffs...................... 77

ii.     Defendant breached its duty to Plaintiffs. ........... 79

iii.    The harm was foreseeable. .................................. 80

iv.     Plaintiffs have sufficiently pled damages. ........... 80

c.      Negligent supervision ................................ 82

d.      Child abduction ................................................ 85

e.      Abuse of process ................................................ 86

f.      Assault and battery ........................................ 88

C.   The Allegations in the JALC Complaint Support Liability Under Michigan Law. ....................................................................... 89

   1.   The Court should apply Michigan law to Jacob and Leya's claims. ................................................................................... 89

   2.   The allegations support each of the Michigan torts pled. ........... 92

      a.   Intentional infliction of emotional distress ..................... 92

      b.   Negligent infliction of emotional distress ....................... 94

      c.   Negligence, negligent undertaking, and breach of fiduciary duty ................................................................ 95

      d.   Child abduction ................................................................ 96

      e.   Abuse of process .............................................................. 97

      f.   Assault and battery .......................................................... 98

      g.   Loss of consortium ........................................................... 99

CONCLUSION .............................................................................................. 99

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A.E.S.E. v. United States*,
  No. 21-cv-0569, 2022 WL 4289930 (D.N.M. Sept. 16, 2022)... 37, 50, 56, 59, 63, 86

*A.F.P. v. United States*,
  No. 21-cv-00780, 2022 WL 2704570 (E.D. Cal. July 12, 2022) .....................passim

*A.I.I.L. v. Sessions*,
  No. CV-19-00481, 2022 WL 992543 (D. Ariz. Mar. 31, 2022)............ 37, 59, 74–75

*A.P.F. v. United States*,
  492 F. Supp. 3d 989 (D. Ariz. 2020)..............................37, 47, 56–57, 57–58, 59, 68

*Adams v. United States*,
  420 F.3d 1049, 1052–55 (9th Cir. 2005) .................................................. 64–65, 65

*Aguilar v. U.S. Immigr. & Customs Enf't*,
  510 F.3d 1 (1st Cir. 2007).............................................................................. 39, 40

*Akutowicz v. United States*,
  859 F.2d 1122 (2d Cir. 1988)............................................................................... 61

*Applebaum v. Nemon*,
  678 S.W.2d 533 (Tex. App. 1984) .................................................................. 78, 79

*Armstrong v. Manzo*,
  380 U.S. 545 (1965) ............................................................................................. 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 83

*Avalos-Palma v. United States*,
  No. 13-5481, 2014 WL 3524758 (D.N.J. July 16, 2014) ....................................... 62

*B.A.D.J. v. United States*,
  No. 21-215, 2022 WL 11631016 (D. Ariz. Sept. 30, 2022)........................ 37, 59, 66

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 65

*Berger v. Weber*,
  303 N.W.2d 424 (Mich. 1981)............................................................................. 99

*Berkovitz ex rel. Berkovitz v. United States,*
   486 U.S. 531 (1988) ........................................................................... 36, 52

*Bhuiyan v. United States,*
   772 F. App'x 564 (9th Cir. 2019) ............................................................ 61

*Bivens v. Six Unknown Named Agents,*
   403 U.S. 388 (1971) ........................................................................... 44, 63

*Blackstock v. Tatum,*
   396 S.W.2d 463 (Tex. App. 1965) ..................................................... 86, 88

*Brown v. Brown,*
   61 N.W.2d 656 (Mich. 1953) ................................................................. 96

*Bryan v. United States,*
   913 F.3d 356 (3d Cir. 2019) .................................................................. 44

*Bryant v. Oakpointe Villa Nursing Center,*
   684 N.W.2d 864 (Mich. 2004) .............................................................. 95

*Burkhardt v. Burkhardt,*
   282 N.W. 231 (Mich. 1938) ............................................................. 96–97

*Butz v. Economou,*
   438 U.S. 478 (1978) ............................................................................... 42

*Buzzanca v. D.C.,*
   No. 18-2893, 2021 WL 796275 (D.D.C. Mar. 2, 2021) ........................ 61

*C.D.A. v. United States,*
   No. 21-469, 2023 WL 2666064 (E.D. Pa. Mar. 28, 2023) ..............passim

*C.M. v. United States,*
   No. CV-19-05217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ..... 37, 47, 57, 59, 79

*Caban v. United States,*
   728 F.2d 68 (2d Cir. 1984) .................................................................... 72

*Calhoun Cnty. v. Blue Cross Blue Shield Michigan,*
   824 N.W.2d 202 (Mich. Ct. App. 2012) ......................................... 95, 96

*Castro v. United States,*
   34 F.3d 106 (2d Cir. 1994) .................................................................... 44

*City of Tyler v. Likes,*
   962 S.W.2d 489 (Tex. 1997) ............................................................ 81, 82

*City of Watauga v. Gordon,*
    434 S.W.3d 586 (Tex. 2014)................................................................. 88

*CNA v. United States,*
    535 F.3d 132 (3d Cir. 2008)................................................................. 64

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) .......................................................................... 37

*Crumpton v. Stone,*
    59 F.3d 1400 (D.C. Cir. 1995) ............................................................ 56

*Culver v. Culver,*
    360 S.W.3d 526 (Tex. App. 2011) ........................................................ 88

*Cunningham v. Waymire,*
    612 S.W.3d 47 (Tex. Ct. App. 2019) .................................................... 76

*D.A. v. United States,*
    No. 22-CV-00295, 2023 WL 2619167
    (W.D. Tex. Mar. 23, 2023) ........................................................passim

*D.B. v. Cardall,*
    826 F.3d 721 (4th Cir. 2016) .............................................................. 47

*D.J.C.V. v. United States,*
    605 F. Supp. 3d 571 (S.D.N.Y. 2022) ................................... 37, 45, 59, 80

*Dalal v. Molinelli,*
    No. 20-cv-1434, 2021 WL 1208901 (D.N.J. Mar. 30, 2021)...................... 63

*Daley v. LaCroix,*
    179 N.W.2d 390 (Mich. 1970)......................................................... 94, 99

*Dangerfield v. Ormsby,*
    264 S.W.3d 904 (Tex. App. 2008) ....................................................... 83

*Daniels v. United States,*
    No. 20-cv-3893, 2021 WL 2327856 (E.D. Pa. June 1, 2021) ................... 64

*Davis v. Dallas Cnty., Tex.,*
    541 F. Supp. 2d 844 (N.D. Tex. 2008)................................................. 78

*Davis v. Wells Fargo*
    824 F.3d 333 (3d Cir. 2016).......................................................... 35, 68

*Doe v. Roman Cath. Archbishop of Archdiocese of Detroit*,
   692 N.W.2d 398 (Mich. Ct. App. 2004) ................................................ 95

*Doe v. YUM! Brands, Inc.*,
   639 S.W.3d 214 (Tex. App. 2021) .................................................. 82–83

*Dolan v. U.S. Postal Serv.*,
   546 U.S. 481 (2006) ............................................................................. 42

*E.O.H.C. v. Barr*,
   434 F. Supp. 3d 321 (E. D. Pa. 2020), *vacated and dismissed*
   *as moot sub nom. E.O.H.C. v. Att'y Gen. United States*, No.
   20-1163, 2020 WL 2111302 (3d Cir. Apr. 20, 2020) ........................... 39

*E.S.M. v. United States*,
   No. 21-cv-00029, 2022 WL 11729644
   (D. Ariz. Oct. 20, 2022) ............................................ 37, 59, 61–62, 66

*Elgamal v. Bernacke*,
   714 F. App'x 741 (9th Cir. 2018) ....................................................... 61

*Espinosa v. Aaron's Rents, Inc.*,
   484 S.W.3d 533 (Tex. App. 2016) ...................................................... 76

*Espinoza v. Thomas*,
   472 N.W.2d 16 (Mich. Ct. App. 1991) ............................................... 98

*F.R. v. United States*,
   No. 21-cv-00339, 2022 WL 2905040 (D. Ariz. July 22, 2022) ....... 37, 45, 66

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ............................................................................. 44

*Firestone v. Rice*,
   38 N.W. 885 (1888) .............................................................................. 93

*Fitzpatrick v. Copeland*,
   80 S.W.3d 297 (Tex. App. 2002) ........................................................ 81

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) ........................................................ 49, 51

*Flores v. Reno*,
   No. CV 85-4544 (C.D. Cal. Jan. 17, 1997) (FSA),
   https://www.clearinghouse.net/chDocs/public/IM-CA-0002-
   0005.pdf.................................................................................passim

*Flores v. Rosen,*
    984 F.3d 720 (9th Cir. 2020) ............................................... 48

*Flores v. Sessions,*
    394 F. Supp. 3d 1041 (C.D. Cal. 2017), *appeal dismissed sub*
    *nom. Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019) ......................... 49, 50

*Flores v. Sessions,*
    No. CV 85-4544, 2018 WL 4945000 (C.D. Cal. July 9, 2018)......................... 49, 51

*Foglia v. Renal Ventures Mgmt., LLC,*
    754 F.3d 153 (3d Cir. 2014)............................................... 68

*Friedman v. Dozorc,*
    312 N.W.2d 585 (Mich. 1981) ............................................. 97

*Fuentes-Ortega v. United States,*
    No. CV-22-00449, 2022 WL 16924223 (D. Ariz. Nov. 14, 2022) ........ 37, 59, 66, 84

*Gann v. Anheuser-Busch, Inc.,*
    394 S.W.3d 83 (Tex. App. 2012) .......................................... 76

*Gould Elecs., Inc. v. United States,*
    220 F.3d 169 (3d Cir. 2000)........................................... 35, 89

*Greater Houston Transp. Co. v. Phillips,*
    801 S.W.2d 523 (Tex. 1990)............................................... 78

*GTE Sw., Inc. v. Bruce,*
    998 S.W.2d 605 (Tex. 1999)............................................... 76

*Hajdusek v. United States,*
    895 F.3d 146 (1st Cir. 2018) ............................................. 51

*Hanson v. United States,*
    712 F. Supp. 2d 321 (D.N.J. 2010) ....................................... 71

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ................................................... 42, 43

*Harper v. LG Elecs. U.S.A., Inc.,*
    595 F. Supp. 2d 486 (D.N.J. 2009) ....................................... 91

*Hart v. Danak*, No. 280975, 2010 WL 1404431 (Mich. Ct. App.
    Apr. 8, 2010) ........................................................... 98

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015)................................................................ 40

*Hatahley v. United States*,
    351 U.S. 173 (1956) ............................................................................ 59

*Helbing v. Hunt*,
    402 S.W.3d 699 (Tex. App. 2012) ............................................. 77, 78, 79

*Hernandez v. United States*,
    No. 17-CV-00087, 2018 WL 4103015 (S.D. Tex. July 2, 2018) ...................... 70–71

*Hill v. Sears Roebuck & Co.*,
    822 N.W.2d 190 (Mich. 2012) ............................................................. 95

*Holcombe v. United States*,
    388 F. Supp. 3d 777 (W.D. Tex. 2019), No. 18-CV-555, 2021
    WL 67217 (W.D. Tex. Jan. 6, 2021) ......................................... 82, 83, 84

*Howell v. City Towing Assocs., Inc.*,
    717 S.W.2d 729 (Tex. App. 1986) ......................................................... 78

*Hughes Wood Prods., Inc. v. Wagner*,
    18 S.W.3d 202 (Tex. 2000)................................................................... 90

*Humphries v. Allstate Ins. Co.*,
    No. 18-cv-11006, 2020 WL 3248896 (E.D. Mich. June 16,
    2020).................................................................................................. 92

*Hunt v. Baldwin*,
    68 S.W.3d 117 (Tex. App. 2001) .......................................................... 86

*Hydrogen Tech. Corp. v. United States*,
    831 F.2d 1155 (1st Cir. 1987) .............................................................. 59

*I.T. v. United States*,
    No. 22-cv-05333, slip op. (N.D. Cal. Feb. 24, 2023)................. 37, 59, 60, 66, 79, 84

*Indian Towing Co. v. United States*,
    350 U.S. 61 (1955) .............................................................................. 60

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
    319 F. Supp. 3d 491 (D.D.C. 2018) .................................................. 46, 47

*Johnson v. Merrell Dow Pharm., Inc.*,
    965 F.2d 31 (5th Cir. 1992) ................................................................. 74

*Jones v. Hyman*,
    107 S.W.3d 830 (Tex. App. 2003) .......................................................................... 75

*Jose L.P. v. Whitaker*,
    431 F. Supp. 3d 540 (D.N.J. 2019) ....................................................................... 47

*J.P. v. Sessions*,
    No. 18-CV-06081, 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019) ............................ 37

*K.O. ex rel. E.O. v. United States*,
    No. 20-cv-12015, 2023 WL 131411 (D. Mass. Jan. 9, 2023) .........................passim

*Kjellvander v. Citicorp*,
    156 F.R.D. 138 (S.D. Tex. 1994) ........................................................................... 86

*Kristensen v. United States*,
    372 F. Supp. 3d 461 (W.D. Tex. 2019) ............................................................ 77, 79

*Lakin v. Rund*,
    896 N.W.2d 76 (Mich. Ct. App. 2016) .................................................................. 98

*Lawrence v. Burdi*,
    886 N.W.2d 748 (Mich. Ct. App. 2016) ................................................................ 97

*Lee v. United States*,
    No. CV 19-08051, 2020 WL 6573258 (D. Ariz. Sept. 18, 2020) ........................... 65

*Lewis v. LeGrow*,
    670 N.W.2d 675 (Mich. Ct. App. 2003) ................................................................ 93

*Liranzo v. United States*,
    690 F.3d 78 (2d Cir. 2012) .................................................................................... 61

*Loaisiga v. Cerda*,
    379 S.W.3d 248 (Tex. 2012) ................................................................................. 88

*Logue v. United States*,
    412 U.S. 521 (1973) .............................................................................................. 67

*Loumiet v. United States*,
    828 F.3d 935 (D.C. Cir. 2016) .............................................................................. 63

*Lozano v. Ortega*,
    No. 14-CV-239, 2014 WL 6611595 (W.D. Tex. Nov. 19, 2014) ........................... 73

*Lucas v. Awaad*,
    830 N.W.2d 141 (Mich. Ct. App. 2013) ................................................................ 92

*Lyttle v. United States*,
  867 F. Supp. 2d 1256 (M.D. Ga. Mar. 31, 2012)...................................................... 62

*Mackey v. U.P. Enterprises, Inc.*,
  935 S.W.2d 446 (Tex. App. 1996) ........................................................................... 82

*Maldonado v. Lloyd*,
  No. 18-CV-3089, 2018 WL 2089348 (S.D.N.Y. 2018) ............................................ 45

*Martin v. Trevino*,
  578 S.W.2d 763 (Tex. App. 1979) ........................................................................... 86

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................................................ 38

*Mayberry v. Pryor*,
  374 N.W.2d 683 (Mich. 1985) ........................................................................... 95, 96

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010) .............................................................................. 16, 68

*Mazur v. United States*,
  957 F. Supp. 1041 (N.D. Ill. 1997) ......................................................................... 61

*McCurdy v. Dodd*,
  352 F.3d 820 (3d Cir. 2003) .................................................................................... 38

*McGowan v. United States*,
  825 F.3d 118 (2d Cir. 2016) .................................................................................... 61

*Merando v. United States*,
  517 F.3d 160 (3d Cir. 2008) ............................................................................... 52, 57

*Mitchell v. Missouri-Kansas-Texas R. Co.*,
  786 S.W.2d 659 (Tex. 1990), *overruled on other grounds*,
  *Union Pac. R. Co. v. Williams*, 85 S.W.3d 162 (Tex. 2002)................................... 77

*Moore v. Bushman*,
  559 S.W.3d 645 (Tex. App. 2018) ...................................................................... 86, 87

*Motsenbocker v. Potts*,
  863 S.W.2d 126 (Tex. App. 1993) ........................................................................... 74

*Ms. L. v. U.S. Immigr. & Customs Enf't*,
  310 F. Supp. 3d 1133 (S.D. Cal. 2018)..............................................................passim

*MVS Int'l Corp. v. Int'l Advert. Sols LLC,*
    545 S.W.3d 180 (Tex. App. 2017) ........................................................................ 74

*Nunez Euceda v. United States,*
    No. 20-CV-10793, 2021 WL 4895748 (C.D. Cal. Apr. 27, 2021) ......... 37, 58, 59, 63

*Ochoa-Salgado v. Garland,*
    5 F.4th 615 (5th Cir. 2021) .................................................................................... 44

*Odom v. Wayne Cnty.,*
    760 N.W.2d 217 (Mich. 2008) .......................................................................... 93, 99

*Olmstead v. Anderson,*
    400 N.W.2d 292 (Mich. 1987) ............................................................................... 91

*Omoniyi v. Dep't of Homeland Sec.,*
    No. 10-1344, 2012 WL 892197 (S.D.N.Y. Mar. 13, 2012) ..................................... 61

*Otis Engineering Corp. v. Clark,*
    668 S.W.2d 307 (Tex. 1983) .................................................................................. 82

*Oversmith v. Lake,*
    295 N.W. 339 (Mich. 1940) ................................................................................... 97

*Parkway Co. v. Woodruff,*
    901 S.W.2d 434 (Tex. 1995) .............................................................................. 80–81

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ............................................................................................... 43

*People v. Bland,*
    218 N.W.2d 56 (Mich. Ct. App. 1974) ................................................................... 96

*Plotkin v. Joekel,*
    304 S.W.3d 455 (Tex. App. 2009) ......................................................................... 77

*Portillo v. United States,*
    No. 17-cv-00394, 2018 WL 523363 (D. Nev. Jan. 22, 2018),
    *aff'd,* 741 F. App'x 415 (9th Cir. 2018) ................................................................. 61

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) ............................................................................................... 38

*Rayonier Inc. v. United States,*
    352 U.S. 315 (1957) ............................................................................................... 42

*Reyna ex rel. J.F.G. v. Hott,*
    921 F.3d 204 (4th Cir. 2019) ................................................................. 39

*Richards v. United States,*
    369 U.S. 1 (1962) ................................................................................... 89

*Roberts v. Auto-Owners Ins. Co.,*
    374 N.W.2d 905 (Mich. 1985) ............................................................... 93

*Roberts v. Salmi,*
    866 N.W.2d 460 (Mich. Ct. App. 2014) ................................................ 95

*Roe v. United States,*
    No. 18-CV-2644, 2019 WL 1227940 (S.D.N.Y. Mar. 15, 2019) ............ 62

*Rosa v. McAleenan,*
    No. 19-CV-00095, 2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) ............ 52

*Ruiz ex rel. E.R. v. United States,*
    No. 13-1241, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) ............... 49, 51, 53, 56

*Ryser v. State,*
    453 S.W.3d 17 (Tex. App. 2014) ............................................................ 73

*S.E.B.M. ex rel. Mendez Felipe v. United States,*
    No. 21-cv-00095, 2023 WL 2383784 (D.N.M. Mar. 6, 2023) ............. 37, 58, 59, 90

*S.R.P. ex rel. Abunabba v. United States,*
    676 F.3d 329 (3d Cir. 2012) ............................................................. 36, 57

*Salazar v. Collins,*
    255 S.W.3d 191 (Tex. App. 2008) .......................................................... 79

*Schanz v. New Hampshire Ins. Co.,*
    418 N.W.2d 478 (Mich. Ct. App. 1988) ........................................... 95, 96

*Sexton v. Ryder Truck Rental, Inc.,*
    320 N.W.2d 843 (Mich. 1982) ............................................................... 92

*Silcott v. Oglesby,*
    721 S.W.2d 290 (Tex. 1986) ............................................................ 82, 85

*Simon v. United States,*
    341 F.3d 193 (3d Cir. 2003) ............................................................ 89, 90

*Smith v. Org. of Foster Families for Equal. & Reform,*
    431 U.S. 816 (1977) ............................................................................... 38

*Snyder v. Farnam Cos., Inc.*,
   792 F. Supp. 2d 712 (D.N.J. 2011) ................................................... 91

*Standard Fire Ins. Co. v. Ford Motor Co.*,
   723 F.3d 690 (6th Cir. 2013) ........................................................... 92

*Stanley v Illinois*,
   405 U.S. 645 (1972) ........................................................................ 38

*Steele v. Cicchi*,
   855 F.3d 494 (3d Cir. 2017) ............................................................ 37

*Sutherland v. Kennington Truck Serv., Ltd.*,
   562 N.W.2d 466 (Mich. 1997) .................................................. 89, 91

*Tandy Corp. v. McGregor*,
   527 S.W.2d 246 (Tex. App. 1975) .................................................. 86

*Tex. Home Mgmt., Inc. v. Peavy*,
   89 S.W.3d 30 (Tex. 2002) .......................................................... 77, 78

*THI of Texas at Lubbock I, LLC v. Perea*,
   329 S.W.3d 548 (Tex. App. 2010) .................................................. 82

*Toms v. McConnell*,
   207 N.W.2d 140 (Mich. Ct. App. 1973) ..................................... 94, 99

*Torrington Co. v. Stutzman*,
   46 S.W.3d 829 (Tex. 2000) ............................................................. 77

*Tovar v. United States*,
   No. 98-CV-1682, 2000 WL 425170 (N.D. Tex. April 18, 2000),
   *aff'd*, 244 F.3d 135 (5th Cir. 2000) ............................................... 72

*Troxel v. Granville*,
   530 U.S. 57 (2000) ......................................................................... 38

*Twyman v. Twyman*,
   855 S.W.2d 619 (Tex. 1993) ....................................................... 74, 92

*U.S. Fidelity & Guar. Co. v. United States*,
   837 F.2d 116 (3d Cir. 1988) ............................................................ 36

*United States ex rel. Atkinson v. Pa. Shipbuilding Co.*,
   473 F.3d 506 (3d Cir. 2007) ........................................................... 35

*United States v. Gaubert,*
    499 U.S. 315 (1991) ................................................................. 36, 51, 52

*United States v. Muniz,*
    374 U.S. 150 (1963) ................................................................. 60

*United States v. Olson,*
    546 U.S. 43 (2005) ........................................................... 60, 69, 70, 71

*Vanderklok v. United States,*
    868 F.3d 189 (3d Cir. 2017) ...................................................... 64

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ................................................................. 41

*Villafranca v. United States,*
    587 F.3d 257 (5th Cir. 2009) .................................................... 70

*Villafuerte v. United States,*
    No. 16-CV-619, 2017 WL 8793751 (S.D. Tex. Oct. 11, 2017) ................. 81

*W.S.R. v. Sessions,*
    318 F. Supp. 3d 1116 (N.D. Ill. 2018) ...................................... 47

*Waffle House, Inc. v. Williams,*
    313 S.W.3d 796 (Tex. 2010) ....................................................... 82

*Wargelin v. Sisters of Mercy Health Corp.,*
    385 N.W.2d 732 (Mich. Ct. App. 1986) ....................................... 94

*Warner Bros. Ent., Inc. v. Jones,*
    538 S.W.3d 781 (Tex. App. 2017) ............................................... 87

*Webster v. Fall,*
    266 U.S. 507 (1925) ................................................................. 44

*Welch v. United States,*
    409 F.3d 646 (4th Cir. 2005) ............................................... 56, 57, 59

*Wellogix, Inc. v. Accenture, LLP,*
    788 F. Supp. 2d 523 (S.D. Tex. 2011) ....................................... 78

*Wilbur P.G. v. United States,*
    No. 21-CV-04457, 2022 WL 3024319 (N.D. Cal. May 10, 2022) ......... 37, 59, 66, 84

*Wilson v. City of Detroit,*
    No. 271522, 2007 WL 677739 (Mich. Ct. App. Mar. 6, 2007) .............. 93

*Wilson v. Layne*,
    526 U.S. 603 (1999) ........................................................................... 42

**STATUTES**

6 U.S.C. § 279.................................................................................... 8, 10, 45

Trafficking Victims Protection Reauthorization Act,
    8 U.S.C. §1232 ...................................................................... 57, 58, 87

8 U.S.C. § 1325 ................................................................................ 11, 13, 46

28 U.S.C. § 1346(b)(1) ................................................................... 64, 70, 84, 89

28 U.S.C. § 2674.......................................................................... 43, 60, 62, 69

28 U.S.C. § 2679(b)(1) .............................................................................. 65

28 U.S.C. § 2680........................................................................................ 36, 71

Tex. Fam. Code Ann. § 42.0 ........................................................................ 88

Texas Penal Code §9.51(a)................................................................. 73, 89

Tex. Pen. Code. § 22.01............................................................................ 88

**REGULATIONS**

8 C.F.R. § 212.5........................................................................................ 49

8 C.F.R. § 1240.26.................................................................................... 29

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ............................................ 35, 69

Federal Rule of Civil Procedure 12(b)(6) ........................................ 36, 68, 69

**GOVERNMENT SOURCES**

E-mail from Matt Albence to Thomas Homan (May 10, 2018,
    10:05 p.m.), https://tinyurl.com/Atlanticdocumentcloud....................... 15

E-mail from Matt Albence to David Jennings (May 25, 2018,
    20:30), https://www.documentcloud.org/documents/23557233-
    we-cant-have-this-albence-writes-about-reunifications......................... 14

E-mail from Matt Albence to Kevin McAleenan, Thomas Homan,
& Ronald Vitiello (May 26, 2018, 2:01 a.m.),
https://tinyurl.com/Atlanticdocumentcloud1 ...................................................... 15

E-mail from Sandi Goldhamer to Eduardo Anchezi (May 26,
2018, 8:04 p.m.), https://tinyurl.com/Atlanticdocumentcloud1 ........................... 15

E-mail from Tae Johnson to Nathalie Asher & Matt Albence
(May 25, 2018, 20:29),
https://tinyurl.com/Atlanticdocumentcloud1 ...................................................... 15

Memorandum from Att'y Gen. to Federal Prosecutors Along the
Southwest Border, *Zero-Tolerance for Offenses Under 8
U.S.C. § 1325(a)* (Apr. 6, 2018) ("Zero Tolerance
Memorandum"), https://www.justice.gov/opa/press-
release/file/1049751/download ............................................................................ 11

Nat'l Pub. Radio, *Transcript: White House Chief of Staff John
Kelly's Interview with NPR*, May 11, 2018,
https://www.npr.org/2018/05/11/610116389/transcript-white-
house-chief-of-staff-john-kellys-interview-with-npr .......................................... 18

*Policy Options to Respond to Border Surge of Illegal
Immigration* (*Policy Options Memo*),
https://s3.documentcloud.org/documents/5688664/Merkleydoc
s2.pdf ......................................................................................................... 9, 11, 13

Remarks by President Trump at 45th [sic] Mile of New Border
Wall, Jan. 12, 2021,
https://trumpwhitehouse.archives.gov/briefings-
statements/remarks-president-trump-45th-mile-new-border-
wall-reynosa-mcallen-tx/ .................................................................................... 16

U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen.,
OEI-09-18-00431, *Care Provider Facilities Described
Challenges Addressing Mental Health Needs of Children in
HHS Custody* 10 (Sept. 2019) (*HHS OIG Rep. 9/19*),
https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf ..................................... 21, 22

U.S. Dep't of Health and Hum. Servs., Off. of Insp. Gen., OEI-
BL-20-00680, *Characteristics of Separated Children in ORR's
Care: June 27, 2018–November 15, 2020* (Nov. 2021),
https://oig.hhs.gov/oei/reports/OEI-BL-20-00680.pdf ........................................ 17

U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen.,
OEI-BL-18-00510, *Communication and Management
Challenges Impeded HHS's Response to the Zero-Tolerance
Policy* (Mar. 2020) (*HHS OIG Rep. 3/20*),
https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf.................................... 8, 19, 22

U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen.,
OEI-BL-18-00511, *Separated Children Placed in Office of
Refugee Resettlement Care*
(Jan. 2019) (*HHS OIG Rep. 1/19*),
https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf................................................. 7

U.S. Dep't of Homeland Sec., *Fact Sheet: Zero-Tolerance
Prosecution and Family Reunification* (June 23, 2018),
https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-
tolerance-prosecution-and-family-reunification.................................................... 20

U.S. Dep't of Homeland Sec., *Implementing the President's
Border Security and Immigration Enforcement Improvements
Policies* (Feb. 20, 2017),
https://www.dhs.gov/sites/default/files/publications/17_0220_
S1_Implementing-the-Presidents-Border-Security-
Immigration-Enforcement-Improvement-Policies.pdf.......................................... 17

U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-20-06,
*DHS Lacked Technology Needed to Successfully Account for
Separated Migrant Families* (Nov. 25, 2019)
(*DHS OIG Rep. 11/19*),
https://www.oig.dhs.gov/sites/default/files/assets/2019-
11/OIG-20-06-Nov19.pdf ........................................................ 8–9, 9, 11, 12, 20, 21

U.S. Dep't of Homeland Sec., Off. of Inspector Gen., *OIG-18-84,
Special Review–Initial Observations Regarding Family
Separation Issues Under the Zero Tolerance Policy*
(Sept. 27, 2018) (*DHS OIG Rep. 9/18*),
https://www.oig.dhs.gov/sites/default/files/assets/2018-
10/OIG-18-84-Sep18.pdf...................................................... 14, 18, 19, 20

U.S. Dep't of Justice, Off. of Inspector Gen., 21-028, *Review of
the Department of Justice's Planning and Implementation of
Its Zero Tolerance Policy and Its Coordination with the
Departments of Homeland Security and Health and Human
Services* (Jan. 2021) (*DOJ OIG Rep. 1/21*),
https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf......................passim

U.S. Dep't of Justice, Off. of Pub. Affs., *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry .......................................................................................... 11

U.S. Gov't Accountability Off., GAO-20-245, *Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS* (Feb. 2020) (*GAO Rep. 2/20*), https://www.gao.gov/assets/gao-20-245.pdf ........................................... 11

U.S. Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts To Reunify Children Separated from Parents at the Border* (Oct. 2018) (*GAO Rep. 10/18*), https://www.gao.gov/assets/700/694918.pdf ..................................... 6, 22

**AGENCY STANDARDS**

U.S. Customs & Border Protection, *National Standards on Transport, Escort, Detention, and Search* (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf....................................... 52, 53, 54, 55, 56, 98

U.S. Dep't of Health & Hum. Servs., Off. of Refugee Resettlement, *ORR Guide: Children Entering the United States Unaccompanied* (Apr. 13, 2022), https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied [https://web.archive.org/web/20220607205416/https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied] ......................................................................... 55

U.S. Dep't of Homeland Sec., U.S. Customs & Border Protection, Memorandum from David V. Aguilar to All Chief Patrol Agents, *Hold Rooms and Short Term Custody* (June 2, 2008), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Hold%20Rooms%20and%20Short%20Term%20Custody%202008_1.pdf........................................................................ 52, 54, 55

U.S. Immigr. & Customs Enf't, *Performance-Based Nat'l Detention Standards 2011* (revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.................................................. 55

OTHER AUTHORITIES

ACLU, *Family Separation by the Numbers* (Oct. 2, 2018),
  https://www.aclu.org/issues/family-separation ...................................................... 17

Daniella Diaz, *Kelly: DHS Is Considering Separating
  Undocumented Children from Their Parents at the Border*,
  CNN, Mar. 7, 2017,
  https://www.cnn.com/2017/03/06/politics/john-kelly-
  separating-children-from-parents-immigration-
  border/index.html ........................................................................................ 6

Caitlin Dickerson, *"We Need To Take Away Children": The
  Secret History of the U.S. Government's Family-Separation
  Policy*, The Atlantic, Aug. 7, 2022, at ch. 6,
  https://www.theatlantic.com/magazine/archive/2022/09/trum
  p-administration-family-separation-policy-
  immigration/670604/ .............................................................................. 14, 15

Michelle Ye Hee Lee, *Donald Trump's False Comments
  Connecting Mexican Immigrants and Crime*, Washington
  Post, July 8, 2015,
  https://www.washingtonpost.com/news/fact-
  checker/wp/2015/07/08/donald-trumps-false-comments-
  connecting-mexican-immigrants-and-crime/.......................................................... 16

Restatement (First) of Conflict of Laws (Am. L. Inst. 1934)...................................... 92

Restatement (Second) of Conflict of Laws (Am. L. Inst. 1971) ........................... 89–90

Restatement (First) of Torts (Am. L. Inst. 1934)........................................................ 96

Restatement (Second) of Torts (Am. L. Inst. 1965) ........................... 74, 77, 85, 93, 95

3 Ronald D. Rotunda & John E. Nowak, *Treatise on
  Constitutional Law* (10th ed. 2012) .................................................................. 41

TRAC Immigration, *"Zero Tolerance" at the Border: Rhetoric vs.
  Reality*, https://trac.syr.edu/immigration/reports/520/ ......................................... 15

**PRELIMINARY STATEMENT**

Defendant's motions to dismiss are exercises in diversion.  The Government asks the Court to look everywhere but at the ugly conduct at the center of these lawsuits: the forcible separation of children from their parents without explanation, information, adequate means of communication, or workable plans for reunification. Defendant focuses instead on its alleged discretion to tighten enforcement of the immigration laws, prosecute immigration crimes, detain immigrants how and where it likes, and designate children as unaccompanied and transfer them to Government custody.  Plaintiffs do not dispute that the Government may have discretion in such matters *in some circumstances and in accordance with governing law and regulations*.  But the Government does not have discretion to terrorize children and hollow out their parents as a signal to other Central American families not to come to the United States.  And when the Government crosses the line into conduct so inhumane that a defense can rest only on diversion, federal law ensures that the United States will be accountable to the people it set out to harm.  That is why at least seventeen district courts around the nation have denied the Government's motions to dismiss in family separation cases.

Considered together, the facts in Plaintiffs' cases demonstrate that the primary tool the Government wielded in its failed effort to deter family immigration was to take children away from their parents—not prosecution, not stricter enforcement of immigration laws, but family separation.

- BYCC ("Beatriz") and MSCC ("Manuel") presented themselves for inspection at the Rio Grande City Port of Entry and claimed asylum—the

lawful way for fleeing migrants to seek protection in the United States. After confining them together for a couple of days in a holding cell, Customs and Border Protection (CBP) officers drove them to the parking lot at the Port Isabel detention center, tore then three-year-old Manuel out of his mother's lap, carried him and his small backpack to a jeep, and placed him in the backseat alone. He screamed, kicked, and cried "Mama," overcoming his speech delay to use that word for the first time in his panic. Beatriz asked for permission to comfort him, and the officers allowed her to stand outside the jeep but not to open the door or hold Manuel, who continued to beat on the windows and scream while his mother watched in horror with her hands pressed against the glass. After approximately half an hour, the officers drove Manuel away, handcuffed Beatriz, and marched her into the detention facility. They did not tell her where they were taking her son, whom they soon flew to a detention facility in New York City. BYCC Compl. ¶¶ 92–106. Although Defendant repeatedly attempts to justify this separation by reference to its discretion to criminally prosecute Beatriz, it had no such discretion because she violated no criminal law.

- JALC ("Jacob") crossed the Rio Grande near Hidalgo, Texas, carrying his then four-year-old daughter LLG ("Leya") on his shoulders. Once on the U.S. side of the river, they approached CBP officers and asked for help. Jacob turned over their documents, including Leya's birth certificate naming him as her father, as well as his Honduran identification card. The officers searched them, confiscated their few belongings, and drove them to the Rio Grande Valley Processing Center. By evening, they were being held in a large area with many other fathers and children. In the middle of the night, officers began calling out names and taking children from their parents. The officers told Jacob to take Leya to the bathroom, which he did. When they came out, she clung to him in the surrounding chaos. An officer grabbed her, pulled her away, and carried her off while she screamed "Papi, Papi!" as she disappeared down the hall. Jacob fell to his knees, weeping, and begged the remaining officers to bring her back. They swore at him, accused him of having kidnapped Leya, and said he would never see her again. Without telling him where they had taken his little girl, officers transferred him to several immigration detention centers over their three-month separation. Other officers flew Leya to a detention facility in Michigan. JALC Compl. ¶¶ 82–92. Although Jacob and Leya had not entered the country through a designated check point, the Government never charged or prosecuted Jacob for any criminal offense.

- RJP ("Rafael") and his then twelve-year-old son ORJJ ("Orlan") entered the United States by crossing the Rio Grande near El Paso, Texas. They walked toward the first CBP officers they saw intending to explain that they were fleeing persecution and death threats in Guatemala (the basis for their grants of asylum three years later). The officers threatened to shoot them and announced their intention to take Orlan away from Rafael. After detaining them for more than two days with inadequate food in freezing holding areas, the officers lined them up with other families in a hallway and told the parents to say goodbye to their children because they would never see them again. Rafael hugged Orlan and whispered that he should trust God and stay strong. Along with other parents, Rafael was transferred to the custody of the U.S. Marshals Service, which transported him and others to the El Paso County Jail. Orlan, who had never spent a night away from his family, cried himself to sleep on the floor of the detention center. The next morning, CBP transferred Orlan to the Clint Border Patrol Station, less than an hour's drive from El Paso. Meanwhile, the U.S. Marshals Service transported Rafael to federal court where he pled guilty to misdemeanor illegal entry. The court sentenced him to time served and released him back to CBP custody. Although Orlan was then in a nearby CBP facility, the Government did not reunify them and did not inform either one of the other's whereabouts. Instead, immigration officers transported them in opposite directions: Rafael to New Mexico and Orlan to East Texas, nearly 1,000 miles apart. RJP Compl. ¶¶ 84–111.

As these accounts demonstrate, the Government was indifferent to how the families entered, whether they were amenable to criminal prosecution or were in fact prosecuted, what evidence was produced of the familial relationship between parent and child, how old the child was, whether reunification was feasible following prosecution, or any other facts particular to one case or another. The Government had made the decision to separate families to deter migration by others like them, and that is what the Government did, taking more than 5,600 children from their parents between July 1, 2017 and January 20, 2021. These separations were not an unfortunate byproduct of the decision to engage in strict immigration enforcement or

-3-

to prosecute crimes—quite the reverse: the random prosecutions and placements in far-flung detention sites were in service of the Government's Family Separation Policy. These facts are more than amply pled and, as the Government itself acknowledges, must be taken as true for the purpose of these motions.

The question before the Court, therefore, is whether the United States exposes itself to tort liability when it severs children from their parents in a manner designed to cause acute distress. The answer to that question is yes.

This Court has jurisdiction over these cases because, through its enactment of the Federal Tort Claims Act (FTCA), the Government has waived its sovereign immunity. The discretionary function exception to the FTCA does not apply because the United States Constitution, federal law, a binding federal consent decree, and agency standards and regulations deprive the Government of the discretion to have implemented the Family Separation Policy at all, let alone in a manner characterized by a combination of cruelty and incompetence. The due care exception does not apply because no federal law or regulation authorized the Family Separation Policy. The United States is susceptible to state tort liability because the conduct of its employees is analogous, for example, to that of private parties who disrupt parent-child relationships or who assume responsibility for the custody of others and then cause harm to those in their control. In accordance with the FTCA, Plaintiffs assert causes of action under applicable state torts and not for the constitutional torts for which the Government might be sued in other kinds of cases. The tortious conduct alleged here was committed by federal employees, many of them law enforcement officers, acting

within the scope of their employment.  That agency leaders directed their employees to commit such torts at a "systemic" level, against thousands of immigrant families, reinforces rather than excuses the Government's liability.

In addition, Plaintiffs pleaded the facts with concreteness, particularity, and plausibility beyond what is necessary to support their claims.  The privileges and immunities that law enforcement officers may enjoy under state law cannot shield the United States in an FTCA case, in which Defendant stands in the position of a *private* individual who does not benefit from such immunities.  In any event, whatever privileges may exist under Texas or Michigan law do not apply to the conduct alleged here.  Moreover, the facts alleged in the Complaints support each of the state law torts pled in each of the cases.

For these reasons, Plaintiffs respectfully urge the Court to deny Defendant's motions to dismiss in their entirety.

## STATEMENT OF FACTS

## I.   Conception, Launch, and Execution of the Family Separation Policy

Most of the facts pled in the Complaint concerning the history and implementation of the Family Separation Policy are drawn from the Government's own reports, public statements, and internal communications.[1]  Given these sources, there can be little doubt about the plausibility of the allegations.

---

[1]   When citing facts that are included in all three Complaints, Plaintiffs cite the lead Complaint as follows: BYCC/G Compl. ¶ __ (the G is for general).  Otherwise, Plaintiffs cite the individual Complaints.  Likewise, when citing a point that appears in all of Defendant's briefs, Plaintiffs cite the brief in the lead case as follows, Def.'s BYCC/G Br. at __.

A.      **The Launch of the Family Separation Policy**

1.      **The El Paso Sector Pilot**

Within months of President Trump's inauguration, family separation emerged as a primary strategy for deterring immigration at the southern border.  In early March 2017, John F. Kelly, then-Secretary of the Department of Homeland Security (DHS), confirmed that DHS was considering a policy of separating migrant families. He stated, "Yes, I'm considering [separating families] in order to deter more movement along this terribly dangerous network.  I am considering exactly that. [Children] will be well cared for as we deal with their parents."[2]

In line with Secretary Kelly's statement, CBP, a subagency within DHS, launched a pilot project to separate families in the El Paso Sector of the southern border in March 2017.[3]  Pursuant to this plan, the El Paso Sector suspended what Border Patrol officials referred to as the "family unit policy," under which they had previously avoided referring migrants for prosecution of immigration offenses if the prosecution would result in family separation.[4]

---

[2]      BYCC/G Compl. ¶ 25 (citing Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border*, CNN, Mar. 7, 2017, https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html).

[3]      *Id.* ¶¶ 26–30 (citing, *inter alia*, U.S. Dep't of Justice, Off. of Inspector Gen., 21-028, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 14–18 (Jan. 2021) (*DOJ OIG Rep. 1/21*), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf;      U.S.      Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts To Reunify Children Separated from Parents at the Border* 14–15 (Oct. 2018) (*GAO Rep. 10/18*), https://www.gao.gov/assets/700/694918.pdf).

[4]      *Id.* ¶ 27 (citing *DOJ OIG Rep. 1/21* at 14).

A January 2019 report from the Office of the Inspector General at the Department of Health and Human Services (HHS) estimated that "thousands of children may have been separated during an influx that began in 2017."[5] Subsequent lengthy investigation led the Government to conclude that it had separated 1,556 children from their parents after July 1, 2017, and released these children from Government custody before June 26, 2018. The Government had ignored these children when it undertook to reunify the thousands of *additional* children still in its custody on that date under the preliminary injunction issued in *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018), an ACLU class action challenging the Family Separation Policy.[6]

The El Paso Sector separations prompted concern and criticism. The Deputy Criminal Chief in the Western District of Texas emailed the U.S. Attorney in August 2017:

> We have now heard of us taking breast feeding defendant moms away from their infants, I did not believe this until I looked at the duty log and saw the fact we had accepted prosecution on moms with one and two year olds. The next issue is that these parents are asking for the whereabouts of their children and they can't get a response . . . .[7]

---

[5]    *Id.* ¶ 32 (citing *U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen.*, OEI-BL-18-00511, *Separated Children Placed in Office of Refugee Resettlement Care* 1 (Jan. 2019) (*HHS OIG Rep. 1/19*), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf).

[6]    Defendants in *Ms. L.* arrived at the number 1,556 after convening a team of data scientists and others to compare several databases in response to a court order expanding the class to include the parents of these earlier-separated children. *Id.* (citing Order Granting Pls.' Mot. to Modify Class Definition, *Ms. L.*, No. 18-cv-00428 (Mar. 8, 2019), ECF No. 386; Order Following Status Conf., *id.* (Apr. 25, 2019), ECF No. 405; Joint Status Rep., *id.* (Nov. 6, 2019), ECF No. 495.

[7]    *Id.* ¶ 33 (citing *DOJ OIG Rep. 1/21* at 16).

U.S. Magistrate Judge Miguel Torres signaled the same concern in an order for additional briefing on the issue of the separations:

> In a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their . . . lack of information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest.[8]

The Office of Refugee Resettlement (ORR), the subagency within HHS responsible for the care and custody of unaccompanied immigrant children, also sounded an early alarm. From November 2017 through early 2018, the then-Deputy Director for Children's Programs contacted senior officials at CBP and Immigration and Customs Enforcement (ICE) to express concern about the increased number of separated children coming into ORR custody. He warned these and other officials that ORR would have neither sufficient bed capacity if separations increased nor the resources to care appropriately for very young children. Further, he cautioned that separation would harm children and undermine ORR's obligation to safeguard their best interests.[9]

In November 2017, shortly after ORR raised concerns, CBP headquarters instructed the El Paso Sector to halt the family separation pilot.[10] After the pilot

---

[8]     *Id.*

[9]     *Id.* ¶ 34 (citing U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen., OEI-BL-18-00510, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* 15–16 (Mar. 2020) (*HHS OIG Rep. 3/20*), https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf); *see also* 6 U.S.C. § 279(b)(1)(B).

[10]     *Id.* ¶ 36 (citing U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-20-06, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant*

ended, the El Paso Sector provided an after-action report to Border Patrol's Acting Chief of Operations calling for greater coordination among the various agencies.[11]  In addition, the U.S. Attorney for the Western District of Texas briefed senior officials at the Department of Justice (DOJ) in late December 2017.[12]  His notes on the briefing referred to "significant 'pushback' from the local community, the press, and other stakeholders with regard to family separations."[13]  Thus, by the end of 2017, high officials in both CBP and DOJ were on notice that the El Paso Sector pilot had harmed parents and children and raised serious concerns about whether the Government was prepared to track and reunify the families it had separated.

## 2.    Expansion to the Whole Southern Border

In December 2017, while continuing to receive reports of problems in the El Paso Sector, DOJ and DHS officials jointly prepared a memorandum entitled *Policy Options to Respond to Border Surge of Illegal Immigration* (*Policy Options Memo*).[14] The first proposal was to "Increase Prosecution of Family Unit Parents."[15]  Noting that "CBP is currently executing this policy on a limited basis in the El Paso Sector," the plan was to "[i]nstruct CBP and ICE to work with DOJ to significantly increase

---

*Families   15   (Nov.   25,   2019)   (DHS   OIG   Rep.   11/19*),   https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf).

[11]    *Id.* ¶ 37 (citing *DHS OIG Rep. 11/19* at 15).

[12]    *Id.* (citing *DOJ OIG Rep. 1/21* at 18).

[13]    *Id.* (citing *DOJ OIG Rep. 1/21* at 18).

[14]    *Id.* ¶ 38 (citing *DOJ OIG Rep. 1/21* at 12).  The original, marked-up memo is available at https://s3.documentcloud.org/documents/5688664/Merkleydocs2.pdf.

[15]    BYCC/G Compl. ¶ 38 (citing *DOJ OIG Rep. 1/21* at 12).

the prosecution of family unit parents when they are encountered at the border."[16] "The parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present would be placed in HHS custody as UACs [unaccompanied alien children].   Because the parents would be criminally prosecuted, they would be placed in the custody of the U.S. Marshal to await trial."[17] The memo acknowledged that "not all parents could be criminally prosecuted," but noted that "the increase in prosecutions would be reported by the media and it would have substantial deterrent effect."[18]

The second recommendation, distinct from the first, was to "Separate Family Units."  Again, deterrence and publicity were key: "Announce that DHS is considering separating family units, placing the adults in detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs)."[19]  This second strategy did not depend on prosecution; the memo argued that separation followed by placement of the parent in adult detention would render the child an "unaccompanied alien child" under federal law because the parent would no longer be "available to provide care and physical custody."[20]  The memo urged "close coordination with HHS, to ensure that sufficient capacity is available to detain the

---

[16]   *Id.* (citing *DOJ OIG Rep. 1/21* at 12).

[17]   *Id.* (citing *DOJ OIG Rep. 1/21* at 12).

[18]   *Id.* ¶ 39 (citing *DOJ OIG Rep. 1/21* at 12).

[19]   *Id.* ¶ 40 (citing *DOJ OIG Rep. 1/21* at 12).

[20]   *Id.* (citing *DOJ OIG Rep. 1/21* at 13 (quoting 6 U.S.C. § 279(g)(2))).

UACs."[21]  Once "legal coordination between DHS, HHS, and DOJ is complete," the memo instructed, "begin separating family units as stated above."[22]

When agency leaders made the policies public, they focused primarily on the first tactic: separating families by way of prosecution.  Attorney General Sessions announced the Government's "Zero-Tolerance Policy for Criminal Illegal Entry" on April 6, 2018, directing the U.S. Attorney's Offices (USAOs) along the southern border to prosecute all persons who commit or attempt to commit unlawful entry under 8 U.S.C. § 1325(a) (the "Zero Tolerance Policy").[23]  A steep escalation in family separations began about a month later, on May 4, 2018, when then-Secretary of Homeland Security Kirstjen Nielsen signed a memorandum implementing the Zero Tolerance Policy by instructing field personnel at CBP to refer parents for prosecution regardless of whether they had arrived with their children.[24]

After the May 4th memo, Attorney General Sessions increased the pressure on the USAOs to prosecute all parents referred by DHS.  The U.S. Attorney for the

---

[21]    *Id.* (citing *DOJ OIG Rep. 1/21* at 13).

[22]    *Id.* (citing *Policy Options Memo* 1 (Dec. 2017), https://s3.documentcloud.org/documents/5688664/Merkleydocs2.pdf).

[23]    *Id.* ¶ 46 (citing U.S. Dep't of Justice, Off. of Pub. Affs., *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry; *see also* Memorandum from Att'y Gen. to Federal Prosecutors Along the Southwest Border, *Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)* (Apr. 6, 2018) ("Zero Tolerance Memorandum"), https://www.justice.gov/opa/press-release/file/1049751/download).

[24]    *Id.* ¶ 49 (citing *DOJ OIG Rep. 1/21* at 27; *DHS OIG Rep. 11/19* at 18; U.S. Gov't Accountability Off., GAO-20-245, *Actions Needed to Improve DHS Processing of Families and Coordination Between DHS and HHS* 13 (Feb. 2020) (*GAO Rep. 2/20*), https://www.gao.gov/assets/gao-20-245.pdf).

Western District of Texas explained: "[E]ven with respect to age of the child, it was a categorical, 'We're prosecuting all.'"[25]  The U.S. Attorneys along the southern border took notes on a May 11th call with the Attorney General, memorializing his direction to them: "[W]e need to take away children."[26]  Between May 5 and June 20, 2018, the Government separated more than 3,000 children from their parents.[27]

### B.    Family Separation as the Chief Deterrent

The evidence abounds that the Government viewed the separation of parents and children as the chief deterrent to Central American family migration.  The President, his cabinet, the leaders of the subagencies in charge of implementation, and the line staff all attempted to justify family separation by referring to its power to stem the inflow of migrants.[28]  Prosecution and detention, the acts the United States here defends as discretionary, were tools to achieve family separation.  Many facts, including the following, demonstrate that the Government executed the Family Separation Policy as an independent and primary strategy aimed at reducing the number of Central American families crossing the southern border.

First, more than fifteen percent of separated parents were not referred for prosecution.[29]  Some, like Beatriz, were not referred because they presented themselves for inspection at authorized ports of entry, in full compliance with the

---

[25]    *Id.* ¶ 50 (citing *DOJ OIG Rep. 1/21* at 41).

[26]    *Id.* (citing *DOJ OIG Rep. 1/21* at 39).

[27]    *Id.* ¶ 56 (citing *DHS OIG Rep. 11/19* at first unnumbered page; *see also id.* at 24).

[28]    *Id.* ¶¶ 24, 25, 29, 39, 40, 62–64.

[29]    BYCC/G Compl. ¶ 54 (citing *DHS OIG Rep. 11/19* at 33).

criminal law.  BYCC Compl. ¶¶ 92 & n.114; *cf.* 8 U.S.C. § 1325.  Others, like Jacob, were not referred even though they may have been "amenable" to prosecution.  JALC Compl. ¶ 82.  Even in the absence of any criminal proceeding, CBP agents tore children away and detained parents and children thousands of miles apart.

Second, although parents were often available for reunification with their children within hours or days after prosecution, the Government kept them separated for months.  The overwhelming majority of parents who were referred for prosecution and charged with misdemeanor illegal entry under 8 U.S.C § 1325 pled guilty in advance and were sentenced to time served.[30]  The Attorney General and other DOJ officials represented to the public that families would be reunited immediately after parents were released from jail.[31]  But that was never the plan.  In accordance with the internal *Policy Options Memo*, the Government had always intended to designate the children as unaccompanied and place them in the custody of ORR,[32] and in fact, CBP transferred the overwhelming majority to ORR rather than reuniting families, either in family detention or on release, when the U.S. Marshals Service turned the parents back over to DHS custody.[33]  For example, DHS transported Rafael and Orlan in opposite directions to facilities hundreds of miles apart *after* Rafael had been released from criminal custody to a CBP location less than an hour from where CBP then held his son.  RJP Compl. ¶ 106.

---

[30]   *Id.* ¶ 52 (citing *DOJ OIG Rep. 1/21* at 4–5).

[31]   *Id.* ¶ 53 (citing *DOJ OIG Rep. 1/21* at 50).

[32]   *Id.* ¶ 38 (citing *DOJ OIG Rep. 1/21* at 12).

[33]   *Id.* ¶ 53 (citing *DOJ OIG Rep. 1/21* at 50).

Third, Government officials intentionally subverted reunification.  At the large CBP Central Processing Center in McAllen, Texas, CBP officers stated that if parents were prosecuted for misdemeanor illegal entry and returned to the facility while their children were still there, CBP would cancel the children's transfers and reunite the families.[34]  Senior officials decided, however, to have the adults transferred directly from court to ICE custody, rather than readmitting them to CBP facilities for possible reunification.  The decision-makers explained that CBP made this change to avoid the "paperwork" involved in readmitting the parents.[35]

The leaders at ICE and CBP who made the decision to prevent swift reunification were not subtle about their goals.  After learning that some families had been reunited immediately upon the parents' release from criminal custody, Matthew Albence, then-head of Enforcement and Removal Operations at ICE, wrote to colleagues, "We can't have this."[36]  He argued that immediate reunification "obviously undermines the entire effort" and makes DHS "look completely ridiculous" for

---

[34]  *Id.* ¶ 69 (citing *U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-18-84, Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 15 *(Sept. 27, 2018) (DHS OIG Rep. 9/18)*, *https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf*).

[35]  *Id.* (citing *DHS OIG Rep. 9/18* at 15).

[36]  *Id.* ¶ 70 (citing Caitlin Dickerson, *"We Need To Take Away Children": The Secret History of the U.S. Government's Family-Separation Policy*, The Atlantic, Aug. 7, 2022, at ch. 6, https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/).  The original e-mail from Matt Albence to David Jennings (May 25, 2018, 20:30) is here: https://www.documentcloud.org/documents/23557233-we-cant-have-this-albence-writes-about-reunifications.

"go[ing] through the effort of prosecuting only to send them to a FRC [Family Residential Center] and out the door."[37]  Tae Johnson, the current director of ICE who then worked with Albence in Enforcement and Removal Operations, agreed that immediate reunification was a "fiasco," and Sandi Goldhamer, then a senior border patrol agent, remarked that "'time served' is not exactly a consequence we had in mind."[38]  Albence's proposed "solutions" included transferring parents who had completed their sentences directly to ICE custody, rather than risking their reunification with their children in CBP custody, or sending children to HHS "at an accelerated pace" to make them unavailable for reunification with their parents.[39]

Fourth, the Government could have achieved the increased rate of prosecution produced by the Zero Tolerance Policy without ever prosecuting a parent who arrived with a child.  The Zero Tolerance Policy never came close to achieving a 100% prosecution rate; the average rate in April-May 2018 was approximately 30%.[40]

---

[37]  BYCC/G Compl. ¶ 70 (citing Dickerson, *supra* note 36, at ch. 6); e-mail from Matt Albence to Kevin McAleenan, Thomas Homan, & Ronald Vitiello (May 26, 2018, 2:01 a.m.), https://tinyurl.com/Atlanticdocumentcloud1.

[38]  BYCC/G Compl. ¶ 70 (citing Dickerson, *supra* note 36, at ch. 6); e-mail from Tae Johnson to Nathalie Asher & Matt Albence (May 25, 2018, 20:29); e-mail from Sandi Goldhamer to Eduardo Anchezi (May 26, 2018, 8:04 p.m.), https://tinyurl.com/Atlanticdocumentcloud1.

[39]  BYCC/G Compl. ¶ 70 (citing Dickerson, *supra* note 36, at ch. 6); e-mail from Matt Albence to Thomas Homan (May 10, 2018, 10:05 p.m.), https://tinyurl.com/Atlanticdocumentcloud.

[40]  In April 2018, CBP apprehended 24,299 adults without children and 4,536 adults with children, and referred 8,298 adults for prosecution, for a prosecution rate of 28.8%.  In May 2018, CBP apprehended 24,465 adults without children and 4,458 adults with children, and referred 9,216 adults for prosecution, for a prosecution rate of 31.9%.  *Id.* ¶ 51 (citing TRAC Immigration, *"Zero Tolerance" at the Border: Rhetoric vs. Reality*, Table 1, https://trac.syr.edu/immigration/reports/520/).

Federal prosecutors could have reached this rate by prosecuting only adults who arrived *without* children in the relevant period.[41]  Prosecuting parents who arrived with children was aimed at family separation, not at increasing the prosecution rate.

## C.  Bias Against Central American Families

Explicit bias against Central American Families fueled the Family Separation Policy.[42]  As a presidential candidate, Mr. Trump famously derided those who arrived at the southern border as "criminals, drug dealers, rapists, etc."[43]  This theme continued throughout the Trump Administration.  Days before he left office, the President spoke at a celebration of having completed 450 miles of border wall: "At this very moment, smugglers and coyotes are preparing to surge the border if our policies are loosened or removed.  I mean, they're literally waiting—big, big groups of people.  Some of them very unsavory, I might add."[44]

The persistent characterization of Central American migrants as criminal, dangerous, and "unsavory"—as an approaching horde whose immigration would "be

---

[41]  *Id.*  Because it apprehended a total of 48,764 adults *without* children in these two months, CBP could have made all 17,514 referrals out of this population and maintained exactly the same prosecution rate.

[42]  *Id.* ¶¶ 179–182.

[43]  Michelle Ye Hee Lee, *Donald Trump's False Comments Connecting Mexican Immigrants and Crime*, Washington Post, July 8, 2015, https://www.washingtonpost.com/news/fact-checker/wp/2015/07/08/donald-trumps-false-comments-connecting-mexican-immigrants-and-crime/.  Courts may consider such "matters of public record" in ruling on a 12(b)(6) motion.  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[44]  Remarks by President Trump at 45th [sic] Mile of New Border Wall, Jan. 12, 2021, https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-45th-mile-new-border-wall-reynosa-mcallen-tx/.

an unmitigated calamity for national security, public safety, and public health"[45]— could not help but infect the Family Separation Policy. The Policy was implemented only at the southern border, not at any other entry point to the United States. Early demographic breakdowns of separated children showed that more than 97% came from El Salvador, Guatemala, Honduras, and Mexico.[46]

The Government's policies and statements reflected disdain for these families. At the beginning of the Administration, on February 20, 2017, then-DHS Secretary Kelly issued a memorandum outlining a comprehensive plan to block migration at the southern border.[47] The memo ordered ICE and CBP to target for deportation parents who had immigrated before their children and later reunited with them in the United States.[48] Alternatively, the memo directed ICE and CBP to refer parents for criminal prosecution for "smuggling" their children into this country. The memo explicitly instructed immigration officers to take these actions "[r]egardless of the

---

[45]    *Id.*

[46]    BYCC/G Compl. ¶ 181 (citing ACLU, *Family Separation by the Numbers* (Oct. 2, 2018), https://www.aclu.org/issues/family-separation); *see also* U.S. Dep't of Health and Hum. Servs., Off. of Insp. Gen., OEI-BL-20-00680, *Characteristics of Separated Children in ORR's Care: June 27, 2018–November 15, 2020* 4 (Nov. 2021), https://oig.hhs.gov/oei/reports/OEI-BL-20-00680.pdf (91% of separated children then in ORR custody came from El Salvador, Guatemala, and Honduras).

[47]    *Id.* ¶ 24 (citing U.S. Dep't of Homeland Sec., *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf).

[48]    *Id.* (citing U.S. Dep't of Homeland Sec., *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* 11 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf).

desires for family reunification."[49]  Fifteen months later, at the height of the Family Separation Policy in May 2018, General Kelly, by then chief of staff to the President, explained that families coming from Central America could not "easily assimilate into the United States into our modern society.  They're overwhelmingly rural people in the countries they come from—fourth, fifth, sixth grade educations are kind of the norm.  They don't speak English, obviously that's a big thing.  They don't speak English.  They don't integrate well, they don't have skills."  In light of these detriments, he said, "a big name of the game is deterrence."[50]

With signals like these coming from the top, it cannot be surprising that CBP officers carried out the separations with open contempt for the parents and children in their charge.  *See, e.g.*, BYCC Compl. ¶¶ 101–106; JALC Compl. ¶¶ 88–94; RJP Compl. ¶¶ 85–86, 92–93, 95–96.

### D.    Cruel and Chaotic Implementation

The Government's implementation of family separations made an inherently inhumane policy even crueler.  CBP and ICE officers failed to inform parents about where their children were going and what was happening to them; children were also left in the dark about their parents' whereabouts.[51]  This was in part because the

---

[49]    *Id.*

[50]    *Id.* ¶ 63 (citing Nat'l Pub. Radio, *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr).

[51]    *Id.* ¶ 71 (citing *DHS OIG Rep. 9/18* at 12–13 (documenting inconsistent and inaccurate information CBP gave parents about their children)).

entities responsible for detaining the parents and children frequently themselves lacked critical information about the separations.  "ICE personnel reported," for example, that "they were often unaware that adults in their custody had been separated from children."[52]  Similarly, the ORR shelters where children were detained reported difficulties identifying parents, especially those of babies and toddlers who were unable to provide their parents' full names and contact information.[53]  Even after ORR learned the identity and location of the parent, caseworkers often could not reach anyone at the immigration detention centers where the parents were held.[54]

The Government also regularly failed to facilitate parent-child communication. Official reviews found that CBP, ICE, and ORR all lacked sufficient and consistent mechanisms for establishing and maintaining communication between separated parents and children.[55]  Indeed, the evidence in these cases shows that ICE and ORR obstructed communication.  BYCC Compl. ¶ 123 (because ICE did not enable free calls, Beatriz could not contact the outside world until her sister put money in her detention account), ¶ 129 (ICE declined to set up video calls between Beatriz and Manuel even though his speech delay made telephone communication more distressing than helpful); JALC Compl. ¶¶ 99, 112 (without money in his account,

---

[52]    *Id.* (citing *DHS OIG Rep. 9/18* at 15).

[53]    *Id.* ¶ 72 (citing *HHS OIG Rep. 3/20* at 25).

[54]    *Id.* (citing *HHS OIG Rep. 3/20* at 25).

[55]    *Id.* ¶ 73 (citing, *e.g.*, *DHS OIG Rep. 9/18* at 13–15; *HHS OIG Rep. 3/20* at 25–27).

Jacob could not contact anyone outside the facility for the first several weeks of detention), ¶¶ 111, 113 (ORR did not respond to Leya's requests to speak to her father or to repeated calls from Jacob); RJP Compl. ¶¶ 125, 133 (Rafael could not make calls for lack of money in his account, and ICE never arranged a call).

The information and communication voids resulted from the Administration's wholesale failure to plan for family separation.  From the El Paso Pilot forward, CBP's electronic systems did not have the functionality to track family separations.[56]  In a stark acknowledgment that family separations would escalate despite inadequate tracking, Secretary Nielsen advised in her May 4, 2018, memo (the one that triggered mass separation) that officers should continue using spreadsheets to record separations because improvements to the agency's electronic system were "still pending."[57]  In June 2018, when separations were at a high point, DHS announced that it had "a central database which HHS and DHS can access and update when a parent(s) or minor(s) information changes."[58]  Upon inspection, however, the DHS Office of the Inspector General found "no evidence that such a database exists."[59]  The use of error-prone manual data entry and the lack of information-sharing among

---

[56]     BYCC/G Compl. ¶ 31 (citing *DHS OIG Rep. 11/19* at 14–15).

[57]     *Id.* ¶ 49 (citing *DHS OIG Rep. 11/19* at 18).

[58]     *Id.* ¶ 57 (citing U.S. Dep't of Homeland Sec., *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification).

[59]     *Id.* (citing *DHS OIG Rep. 9/18* at 10).

agencies meant that officials could not reliably identify which individuals had been separated or which children belonged with which parents.[60]

Because any data the Government collected about separated families were incomplete, contradictory, and unreliable,[61] the Government's reunification efforts were defined by chaos. Before issuing the preliminary injunction in *Ms. L.,* Judge Sabraw confirmed with the Government that "there was no procedure in place for the reunification of these families."[62] Nine months later, as of March 2019, "the working group [on family reunification] still did not have a formal reunification plan in place."[63] ORR shelter staff responsible for the children reported pervasive "uncertainty around how or when reunification would happen. For example, case managers in facilities were not always able to let children know when, or even if, they would be reunified with their parents, or whether that reunification would happen in the United States."[64] Moreover, logistical issues plagued the process. "Facilities reported that some reunifications were scheduled with little advance notice, or suddenly canceled or delayed, which increased the levels of uncertainty and anxiety

---

[60]    *Id.* ¶ 31 (citing *DHS OIG Rep. 11/19* at 14–15).

[61]    *Id.* ¶ 77 (citing *DHS OIG Rep. 11/19* at 11–12).

[62]    310 F. Supp. 3d at 1140–41.

[63]    BYCC/G Compl. ¶ 77 (citing *DHS OIG Rep. 11/19* at 24).

[64]    *Id.* ¶ 78 (citing U.S. Dep't of Health and Hum. Servs., Off. of Inspector Gen., OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 11 (Sept. 2019) (*HHS OIG Rep. 9/19*), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf).

in separated children and other children in the facility."[65]   Reunifications were also delayed long past the court-imposed deadlines.[66]

In the absence of effective data collection, storage, and tracking, the Government's reported numbers of affected families shifted constantly in the years following the implementation of the Family Separation Policy.  The total reported in the *Ms. L.* litigation is "5,648 children known to have been separated between July 1, 2017 and Jan. 20, 2021."[67]  This number, like others before it, results from extensive efforts to reconstruct what happened.[68]  As of October 25, 2022, a special steering committee was still attempting to identify and contact the missing parents of 151 separated children.[69]

## II.   Separating Plaintiff Parents and Children

### A.   Beatriz and Manuel

Beatriz and her then three-year-old son Manuel fled El Salvador in May 2018. BYCC Compl. ¶ 91.  They ran when Manuel's father ("Steven"), a local gang leader then in prison, threatened to have his lieutenants kill Beatriz and kidnap Manuel if

---

[65]    *Id.* (citing *HHS OIG Rep. 9/19* at 11; *see also HHS OIG Rep. 3/20* at 31 (documenting delayed, botched, and failed reunifications)).

[66]    *Id.* (citing *GAO Rep. 10/18* at 33).

[67]    *Id.* ¶ 58 (citing Decl. of Marc Rosenblum, *Ms. L.*, No. 3:18-cv-428 (Sept. 22, 2021), appended to Joint Status Rep., ECF No. 616).

[68]    *Id.* (citing Decl. of Marc Rosenblum, *Ms. L.*, No. 3:18-cv-428 (Sept. 22, 2021), appended to Joint Status Rep., ECF No. 616).

[69]    *Id.* ¶ 59 (citing Joint Status Rep. 3, *Ms. L.*, No. 18-cv-00428 (Oct. 25, 2022), ECF No. 660).  As of April 12, 2023, when the last Joint Status Report was filed, the parties were still trying to find the missing parents of 95 children.  Joint Status Rep. 3, *Ms. L.*, No. 18-cv-00428 (Apr. 12, 2023), ECF No. 679.

she did not bring his son to the prison and register herself as his "intimate partner" so she could spend nights with him there. *Id.* ¶ 90. Manuel was conceived by rape during earlier, coerced "intimate" visits, motivated in part by Steven's intention to make a real woman of Beatriz, who is a lesbian. *Id.* ¶ 86.

On May 28, Beatriz and Manuel arrived at the Rio Grande City Port of Entry, an authorized checkpoint, presented themselves for inspection, and sought admission to the United States. *Id.* ¶¶ 91–92. The CBP officers at the checkpoint processed them, confirmed that they did not have entry documents, and detained them in a small, extremely cold room at the port of entry. *Id.* ¶¶ 92–94. The officers gave them each a hamburger and water but no blankets or other bedding and no milk, juice, diapers, or wipes. *Id.* ¶¶ 94, 97. Manuel, who had a speech delay but communicated with his mother through gestures and sounds she understood, repeatedly told Beatriz that he was cold and hungry. *Id.* ¶ 95. They remained together in this small room for two days. *Id.* ¶ 97.

On or around May 30, CBP officers loaded Beatriz and Manuel into the backseat of a jeep and drove them to the parking lot of the Port Isabel Detention Center in Los Fresnos, Texas. *Id.* ¶ 100. Upon arrival, one of the officers said in Spanish, "The kid needs to go in the other truck." *Id.* ¶ 101. Beatriz did not understand what he meant, and she froze. An officer then grabbed Manuel and his small backpack out of Beatriz's lap and put him in the backseat of another jeep. *Id.* As the officers carried him away, Manuel began screaming and hitting them. He cried "Mama," using that word for the first time in his panic. *Id.* ¶ 102. Once in the

other jeep, he began pounding at the windows and screaming for his mother. *Id.* ¶ 103. After a few minutes, Beatriz could not stand it any longer, and she got out of the first jeep. She asked the Spanish-speaking officer, who was chatting with others nearby, if she could go to Manuel, and he did not stop her, but the officers would not let her into the vehicle. *Id.* ¶ 104. For many minutes, she stood with her hands against the glass trying to comfort her son while he screamed and thrashed. *Id.* ¶¶ 104–105. Then officers got into the jeep and drove Manuel away. *Id.* ¶ 105. Other officers handcuffed Beatriz and took her into the detention center. Beatriz and Manuel did not see each other again for 42 days. *Id.* ¶ 106.

Despite Beatriz's repeated, desperate requests, ICE officers at Port Isabel gave her no information about Manuel or his whereabouts. *Id.* ¶¶ 107, 109. She learned from other women at the detention center that their children had also been taken, and the news that ran constantly on the television in the common room confirmed that CBP was separating hundreds of families and that children were often held in terrible conditions. *Id.* ¶¶ 110–111.

Meanwhile, officers transported Manuel to the Ursula Central Processing Station in McAllen, Texas, and by air from there to Abbott House in the Bronx, New York, on or around June 2, 2018. *Id.* ¶ 115. The caseworkers and clinicians at Abbott House reported that Manuel was "very distraught and tearful" on arrival, cried continuously for his mother, reacted with fear to anyone who came near him, and could not provide information because of his age and speech delay. *Id.* ¶¶ 116–120.

Nevertheless, someone at Abbott House somehow identified Beatriz as Manuel's mother and managed to reach her at Port Isabel on or around June 3. *Id.* ¶ 122. A few days later, on June 6, Beatriz was able to speak to Manuel, but the call did not allay her fears. Manuel cried hysterically throughout and could only say "Mama." Without seeing each other, Beatriz and Manuel could not communicate with their usual gestures and sounds. They spoke about twice a week after this initial call, but each interaction was the same. Manuel would shout "Mama" and then cry for the rest of the short call. *Id.* ¶¶ 128–129. Beatriz asked the officers at Port Isabel to set up a video call, but they said this was not available. *Id.* ¶ 129. Manuel's case manager regularly told Beatriz that he was neither eating nor sleeping well. *Id.* ¶¶ 122, 130–131. Neither was she. *Id.* ¶¶ 113, 132. Throughout her detention at Port Isabel, Beatriz experienced long crying jags, terrible headaches, dizziness, heart palpitations, and overwhelming fear and worry. *Id.* ¶ 112.

On or around June 18, despite the trauma of her separation from Manuel, Beatriz passed a credible fear interview, entitling her to pursue her asylum claim through the immigration courts. *Id.* ¶ 96 n.115. That claim is still pending.

Sometime later, Beatriz learned through television reports that a court had ordered family reunification, and on July 11, ICE officers informed her that she would be transported to New York and reunified with Manuel. *Id.* ¶¶ 135–136. The reunification did not go well. A social worker carried Manuel into a large room with other parents and children, but he did not want to go to his mother. He kept trying to climb back into the social worker's arms. He would not look at Beatriz, and when

the social worker left and Beatriz picked him up, he began to fight her and cry. *Id.*
¶¶ 142–145. They went together to Beatriz's sister's apartment in New Jersey where,
for many weeks, he exhibited both anger toward his mother and panic whenever she
had to leave him for any reason. *Id.* ¶¶ 146, 150–151. The psychological and physical
consequences of their forced separation persist to this day. *Id.* ¶¶ 147–158.

### B.  Jacob and Leya

A local gang in rural Honduras killed members of Jacob's extended family,
attacked Jacob at gunpoint, and issued written death threats in retaliation for his
family's support for, and his employment by, a political party with a strong anti-gang
stance. JALC Compl. ¶ 81. Jacob and his life-partner "Melisa" decided to use their
scarce resources to enable Jacob and their older child Leya, then four years old, to
escape to the United States. *Id.*

After weeks of travel, Jacob and Leya arrived on April 7, 2018, crossing the Rio
Grande near Hidalgo, Texas. *Id.* ¶ 82. They walked on the U.S. side toward a bridge
where they saw CBP officers and asked for help. *Id.* Jacob presented his Honduran
identification card; Leya's birth certificate, which identifies him as her father; and a
notarized letter from Melisa consenting to Leya's travel with him. *Id.* A male officer
searched them both, reaching under Leya's clothes and lifting her skirt even though
female officers stood nearby. *Id.* ¶ 83. The officers then transported them to the Rio
Grande Valley Centralized Processing Center in McAllen, Texas. *Id.*

Other officers processed them, searched them again, held them for a few hours
in what detainees call the *hielera* (icebox), and then walked them to a large building
and placed them in a fenced area with dozens of other fathers and children. *Id.*

¶¶ 85–86.  In the middle of the night between April 7 and 8, officers began calling out names and taking children from their parents.  The officers called Jacob's name, told him they were going to take Leya away, and ordered him to take her to the bathroom. When Jacob and Leya came out of the stall, he tried to tell her what was happening, and she clung to him, screaming.  An officer grabbed Leya and pulled her away.  She screamed "Papi, Papi!" as she disappeared down the hallway.  *Id.* ¶ 88.

Crying, Jacob knelt and begged the officers to bring her back.  The officers responded with taunts, accusing him of having stolen her and saying God would punish him.  He told them that Leya was his daughter, that he had given them her birth certificate listing him as her father, and that he was more than willing to take a DNA test.  They ignored him.  *Id.* ¶ 89.  Because he was so distraught, they moved him to a solitary cell.  On the way, one of the officers swore at him: "Motherfucker, you're going to pay for this!  You'll never see that little girl again!"  *Id.* ¶ 90.  Later that night, Jacob caught a glimpse of Leya as officers carried her from room to room. She cried out for him.  That was the last time they saw each other for ninety-three days.  *Id.* ¶¶ 91–92.

The next day, April 8, officers told Jacob he would be deported.  *Id.* ¶ 93.  He repeatedly begged to know what had happened to Leya and asked to see her.  An officer responded, "Shut your fucking mouth, you son of a bitch," and again told Jacob he would "pay" for "kidnapping" her.  *Id.* ¶ 94.  Over the next three weeks or so, officers moved Jacob from one Texas detention facility to another.  *Id.* ¶¶ 96, 100. Having no money in his detention account, Jacob was unable to communicate with

the outside world until another detainee allowed Jacob to use credit from his account. Jacob called his sister "Nina" in New Jersey, who told him that ORR had been in touch and that Leya was in Michigan. Jacob had never heard of Michigan. *Id.* ¶ 99.

In fact, DHS had flown Leya to Grand Rapids on or around April 9 and placed her in ORR custody at Bethany Christian Services. *Id.* ¶ 104. During medical screening, four-year-old Leya was diagnosed with physical symptoms, including stomach pain, sleeplessness, and a skin rash. *Id.* ¶ at 107. When meeting with her caseworker and clinician, she cried continuously and pleaded to speak with her father and mother. *Id.* ¶¶ 105, 107. Her individual therapist reported that she exhibited "crying, withdrawal, stated fearfulness, catatonic repetition of phrases such as 'they left me alone.'" *Id.* ¶ 109 (quoting ORR Case Review (July 8, 2018)). Later, Leya shut down and refused to speak to the therapist altogether. *Id.* Her teachers noted that she was very afraid of interaction with adults. *Id.* ¶ 110.

Jacob, too, was suffering the effects of the separation. He could not sleep or concentrate. His mind often went blank. He had trouble eating and lost weight. He developed intense, piercing headaches. He spent much of his time in prayer. *Id.* ¶ 95. Like Beatriz, he saw on the detention center television that separated children had been abused. He felt powerless to protect his little girl. *Id.* ¶ 102.

On or around May 1, about three weeks after the separation, DHS transported Jacob by air to the Elizabeth Detention Center in New Jersey. *Id.* ¶ 100. Once there, he passed a reasonable fear interview, earning the right to have his case heard in immigration court where it remains pending today. *Id.* ¶ 101. His sister Nina

deposited some money in his detention account and gave him the telephone number she had for Leya's caseworker. Jacob called the number every day for over a month, but no one ever answered or returned his calls. Nina told him that the caseworker advised that he stop calling because he was going to be deported while Leya would stay in the United States. *Id.* ¶ 113. Jacob reached out to an organization on the list of pro bono lawyers he had been given and was eventually matched with volunteer attorneys. They arranged for his first communication with Leya on June 21, 2018, seventy-four days after the initial separation. *Id.* ¶ 114. Jacob broke down when he heard Leya's voice. He told her he loved her; she said she wanted to come back to him. *Id.* ¶ 116.

On July 8, 2018, ICE transported Jacob to the Calhoun County Jail in Battle Creek where he remained until July 10. *Id.* ¶ 118. He called his sister from the jail, and she alerted his lawyers that Jacob had been flown to Michigan. They flew out to meet him there. *Id.* ¶ 119. When his lawyers arrived in Michigan, ICE officers informed them that Jacob had agreed to voluntary departure.[70] This was false, and the attorneys acted quickly to correct this misinformation and to assist Jacob with the paperwork necessary for release and reunification. JALC Compl. ¶ 119.

Meanwhile, at the jail, immigration officers arranged for an unexpected video call between Jacob and Leya, but when the call was initiated, a young boy appeared on the screen looking for his father. Believing that the agents had mistaken Leya for

---

[70]     Voluntary departure is a form of immigration relief in which the immigrant agrees to return to his country of origin. 8 C.F.R. § 1240.26.

a different child and did not actually know where she was, Jacob wept. *Id.* ¶ 120. His attorneys later contacted Bethany Christian Services and confirmed that Leya was there and being prepared for reunification with her father. *Id.* ¶ 121.

On July 10, officers transferred Jacob to the ICE office in Grand Rapids where he waited for hours until Leya and three other children arrived. *Id.* ¶ 122. Jacob and Leya embraced, but Jacob believed his daughter was in shock. She would not open up to him, and she would not speak to any other adult. She seemed scared, hurt, and resentful. *Id.* ¶ 125. For several weeks after their reunification, Leya would cry and throw herself on the floor whenever Jacob had to leave her with other family members. Sometimes, her fear was so great that he took a little mat to the bodega where he worked nights and put her to sleep under the cash register. *Id.* ¶ 30. The trauma of the separation has left indelible scars. *Id.* ¶¶ 130–136.

### C.    Rafael and Orlan

At the end of 2017, Rafael and his family faced escalating death threats in Guatemala because of his opposition to attempts by a local governing body to deprive his family of their right to ancestral indigenous lands. RJP Compl. ¶ 83. One written note threatened Rafael and his youngest son Orlan with decapitation, which was how Rafael's father and uncle had earlier been murdered. *Id.* The family made the decision that Rafael and Orlan should flee. Orlan was then twelve years old. *Id.*

After a long journey, Rafael and Orlan crossed the Rio Grande at a dry riverbed near El Paso, Texas, on June 15, 2018. They approached the first CBP officers they saw. *Id.* ¶ 84. One of the officers began shouting at them in Spanish: "You know I can shoot you, because this is as if you were entering my home through a window

when there is a door.  I can shoot you like a thief because that is what you are doing here."  *Id.* ¶ 85.  Rafael told the officer they were fleeing from danger in their country, and the officer responded, "Now I am going to take you to jail and take your son from you."  *Id.* ¶ 86.  The officers took Rafael and Orlan to the El Paso Service Processing Center where they were detained for days with other fathers and sons in a filthy, cold *hielera*, provided with only one foil sheet, and fed meagre, cold food.  *Id.* ¶¶ 87–91, 94.  Worse than the physical surroundings was the conduct of the guards, who regularly entered the holding area and yelled at the detainees that they would deport the adults and send the children to shelters.  *Id.* ¶¶ 92–93.

On their third day in the facility, officers ordered Rafael, Orlan, and dozens of other parent-child pairs into the hallway.  *Id.* ¶ 95.  An officer told Rafael to say goodbye to Orlan "because they were not going to see each other again."  *Id.* ¶ 96.  Rafael hugged Orlan and whispered that he should "keep his spirits up" and "put God first."  They cried as they parted.  *Id.*  The officers escorted the children back into the *hielera*.  The adults were transferred to the custody of the U.S. Marshals Service, which took them to the El Paso County Jail.  *Id.* ¶ 100.  Rafael and Orlan did not see each other again for thirty-seven days.  *Id.* ¶ 97.

Early the next morning, June 18, CBP officers woke Orlan and the other boys in his cell and took them on a short drive to the Clint Border Patrol Station in Clint, Texas.  *Id.* ¶ 101–102.  That same day, the U.S. Marshals Service transported Rafael to the United States District Court for the Western District of Texas in El Paso.  A lawyer at the court advised Rafael to plead guilty to misdemeanor illegal entry in the

hope of speeding up his reunification with Orlan.  *Id.* ¶ 105.  Rafael did so and was sentenced to time served.  *Id.*  Officers then took him back to the CBP El Paso Processing Center from which they had removed Orlan earlier that day.  *Id.*  Unbeknownst to them, Rafael and Orlan slept that night in CBP facilities less than an hour apart, each frantic about what had happened to the other.  *Id.* ¶¶ 103–105.

The following day, ICE officers loaded Rafael and approximately thirty other detainees into a bus and drove them to an airfield.  Rafael believed he was being deported without his twelve-year-old son.  *Id.* ¶¶ 107–108.  Instead, the group was transferred to another bus and driven several hours west to the Cibola County jail in Milan, New Mexico, which contracted with ICE to house detainees.  *Id.* ¶ 109.  The next day, officers loaded Orlan and other children at the Clint Station into a bus and sent them in the opposite direction, east across Texas.  In the middle of the night on June 20, 2018, after a drive of more than 700 miles, the bus dropped Orlan at Southwest Key Casa in Houston, an ORR contractor.  *Id.* ¶¶ 110–111; *see also* Decl. of James S. De La Cruz ¶ 16 (Mar. 6, 2023), ECF No. 14-2 (confirming that Orlan was "referred to ORR and placed at SWK Casa Houston" on June 20, 2018).

When Orlan got to Southwest Key, he told his caseworker that he had been separated from his father and asked to speak to Rafael.  Orlan's caseworker looked up Rafael in the ICE detainee locator system but found no results.  *Id.* ¶¶ 112–113; *see also* ¶ 115 (when the caseworker checked the locator the next day, it provided an incorrect location).  Orlan lay in bed that night with no way to contact his father, afraid that he was now alone in a foreign country and might never see his family

again.  He tried to follow his father's advice to keep his spirits up, presenting a strong front to his caseworkers and clinicians.  *Id.* ¶ 117.  But at night, when alone, he felt deep anxiety and sadness, and he could not sleep because of his repetitive thoughts about where his father might be and whether he was okay.  *Id.* ¶ 119.  While keeping busy during the day, Orlan felt as if he were watching himself in a movie, as if his feelings were not his own.  *Id.* ¶ 120.  He felt irritable and hopeless, but when asked about his feelings, he choked on his words and said nothing.  *Id.* ¶¶ 121, 166.

At Cibola, Rafael was trapped in the same cycle of worry and fear as his son. He could not stop thinking about where Orlan was and whether he was safe.  *Id.* ¶ 123.  Rafael suffered severe head and stomach pain, sleeplessness, nightmares, and loss of weight and appetite.  *Id.* ¶ 156.

Rafael could not make calls because he had no money in his detention account, but on July 2, approximately two weeks after the separation, ORR located Rafael and reached out to the social worker at the Cibola jail.  Rafael and Orlan talked later that day.  *Id.* ¶¶ 125, 128–129.  The call offered some relief, but only briefly.  Shortly after the call, Orlan's caseworker told him that Rafael would be deported and Orlan would be released to a relative, possibly a cousin in New Jersey whom he had never met. Orlan burst into tears.  He could not bear the idea of staying in the United States without anyone he knew and loved.  *Id.* ¶¶ 130–131.  Rafael had a parallel experience. Orlan's caseworker pressed Rafael to allow Orlan to be released to his cousin.  Rafael asked for time to think and talk to Orlan.  *Id.* ¶ 132.

Just over two weeks later, Rafael was transferred to the Otero County Processing Center in Chaparral, New Mexico. Several days after that, officers asked whether he wanted to be reunited with his son, and he said yes. *Id.* ¶¶ 134–135.

On or around July 23, 2018, a van picked Orlan up from Southwest Key in Houston. After making a stop to pick up a woman who escorted Orlan during his travels, the van went to an airport. The escort told Orlan they were flying to a different state to meet his father. They spent all day traveling, taking two flights followed by a long van ride, to arrive at a facility somewhere in the southwest. *Id.* ¶¶ 138–142. Orlan waited in the van while his escort spoke to people at the facility. Eventually, his escort told Orlan that his father was not there. Orlan saw the escort frantically making phone calls. Realizing that the people in charge did not know where his father was, Orlan was instantly filled with despair. He relived the initial separation and felt again that his father was lost to him. *Id.* ¶ 143–144. After another long van ride, they arrived at a location where Orlan spent the night. The escort told him that he would see his father the next day. *Id.* ¶ 144.

On July 24, Orlan and the escort again boarded the van and drove for several hours to the El Paso Processing Center where the ordeal had begun. They sat with other children and escorts in a large waiting room. *Id.* ¶¶ 146–148. Meanwhile, Rafael was transported from the Otero facility to the El Paso Processing Center. After he signed the necessary papers, he was sent to the waiting room where Orlan had been sitting for hours. *Id.* ¶¶ 149–151. The two saw each other and embraced tightly. *Id.* ¶ 152. Volunteers from the nonprofit Annunciation House in El Paso took

the reunified families to their facility, fed them dinner, and helped them arrange travel to their destinations.  *Id.* ¶ 153.

Rafael and Orlan flew to New Jersey the next day.  *Id.*  They now permanently reside in this State, having been granted asylum in 2021.  *Id.* ¶¶ 11–12.  Although they have managed to renew their close bond, the separation changed them.  Their anxieties, flashbacks, and other symptoms persist to this day.  *Id.* ¶¶ 154–172.

## ARGUMENT

## I.    This Court Has Jurisdiction.

### A.    Standard of Review

A challenge to subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) may take two forms: a facial attack or a factual challenge.  *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016); *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007).  Defendant concedes that its motions present facial challenges.  Def.'s BYCC/G Br. at 10.[71]  "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

### B.    The Discretionary Function Exception Does Not Shield the Government from Liability for Forcibly Separating Plaintiffs.

Under the discretionary function exception (DFE) to the FTCA, the Government is not liable for tortious acts "based upon the exercise or performance or

---

[71]    Defendant makes a "factual attack" only as to "claims . . . based on the allegedly tortious conduct of an ORR contractor," *id.*, but Plaintiffs' tort claims all allege misconduct by government employees, *infra* Point I.E.3.

the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Government bears the burden of showing that the DFE applies. *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 n.2 (3d Cir. 2012). To sustain that burden, the Government must show that its actions (1) "involv[e] an element of judgment or choice," and (2) are "based on considerations of public policy." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (alteration in original) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). But the DFE does not apply when the Constitution, a statute, a court order, or internal agency rules deprive federal officials of the discretion to have engaged in the alleged conduct. *U.S. Fidelity & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) ("[C]onduct cannot be discretionary if it violates the Constitution, a statute, or an applicable regulation."). That is the case here.

### 1. The Complaints adequately allege violations of the Due Process and Equal Protection Clauses of the Federal Constitution.

The Complaints plausibly allege that the Government violated both the Due Process and Equal Protection Clauses by forcibly separating Manuel, Leya, and Orlan from their parents, without justification, to deter Central American migrants from seeking humanitarian protection in the United States. Because these allegations are "sufficient to survive a 12(b)(6) motion if this Court were considering the conduct's constitutionality directly," the allegations defeat the application of the DFE. *K.O. ex rel. E.O. v. United States*, No. 20-cv-12015, 2023 WL 131411, at *8 (D. Mass. Jan. 9, 2023). Indeed, every court but one to have assessed the constitutionality of the

Government's Family Separation Policy has held that the DFE does not apply because plaintiffs plausibly alleged constitutional violations.[72]

> ### a.   The Due Process Clause overrides the Government's discretion.

The Government separated Plaintiff parents from their children without regard for their longstanding right to family integrity, in violation of the Due Process Clause.  BYCC Compl. ¶¶ 169–176; JALC Compl. ¶¶ 147–154; RJP Comp. ¶¶ 183–190.  In determining whether a substantive due process right applies to executive action, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *Steele v. Cicchi*, 855 F.3d 494, 502 (3d Cir. 2017).  Intentionally separating children from

---

[72]    *A.E.S.E. v. United States,* No. 21-cv-0569, 2022 WL 4289930, at *11 (D.N.M. Sept. 16, 2022); *A.F.P. v. United States*, No. 21-cv-00780, 2022 WL 2704570, at *12–13 (E.D. Cal. July 12, 2022); *A.I.I.L. v. Sessions*, No. CV-19-00481, 2022 WL 992543, at *2–3 (D. Ariz. Mar. 31, 2022); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996–97 (D. Ariz. 2020); *B.A.D.J. v. United States*, No. 21-215, 2022 WL 11631016, at *3 (D. Ariz. Sept. 30, 2022); *C.M. v. United States*, No. CV-19-05217, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020); *D.A. v. United States*, No. 22-CV-00295, 2023 WL 2619167, at *8–10 (W.D. Tex. Mar. 23, 2023); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 591–97 (S.D.N.Y. 2022); *E.S.M. v. United States*, No. 21-cv-00029, 2022 WL 11729644, at *5 (D. Ariz. Oct. 20, 2022); *F.R. v. United States*, No. 21-cv-00339, 2022 WL 2905040, at *3 (D. Ariz. July 22, 2022)*; Fuentes-Ortega v. United States*, No. CV-22-00449, 2022 WL 16924223, at *2–3 (D. Ariz. Nov. 14, 2022); *I.T. v. United States*, No. 22-cv-05333, slip op. at 11–13 (N.D. Cal. Feb. 24, 2023); *K.O.*, 2023 WL 131411, at *8–10; *Nunez Euceda v. United States*, No. 20-CV-10793, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021); *Wilbur P.G. v. United States*, No. 21-CV-04457, 2022 WL 3024319, at *4 (N.D. Cal. May 10, 2022); *see also Ms. L.*, 310 F. Supp. 3d at 1142–46; *J.P. v. Sessions*, No. CV18-06081, 2019 WL 6723686, at *4–5 (C.D. Cal. Nov. 5, 2019); *but see S.E.B.M. ex rel. Mendez Felipe v. United States*, No. 21-cv-00095, 2023 WL 2383784, at *15 (D.N.M. Mar. 6, 2023).

parents to cause trauma and deter migration shocks the conscience, as does failing to reunify children and parents who were torn apart. *Ms. L.*, 310 F. Supp. 3d at 1142–46; *D.A.*, 2023 WL 2619167, at *9 (holding that continued separation after parents' release from criminal to immigration custody plausibly violates due process right to family integrity). These cases rely on a long line of decisions protecting the right to family integrity.[73]

Moreover, the "procedural component of parental due process rights . . . requires rigorous adherence to procedural safeguards anytime the state seeks to alter, terminate, or suspend a parent's right to the custody of his minor children." *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003) (citing *Stanley v Illinois*, 405 U.S. 645, 656–57 (1972)); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Plaintiffs were not afforded any opportunity to challenge the separation, either before or after it occurred. BYCC Compl. ¶ 175; JALC Compl. ¶ 153; RJP Compl. ¶ 189.

---

[73]   *See, e.g., Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *see also Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (explaining that the liberty interest in family relationships has its source in "intrinsic human rights").

Defendant argues that the right to family integrity does not exist in the context of immigration detention. Def.'s BYCC/G Br. at 23 (citing *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 210 (4th Cir. 2019)). This assertion is too sweeping. *Hott* and similar cases involve instances where the parent was lawfully detained or deported while the child remained in the community. In *Aguilar v. U.S. Immigration and Customs Enforcement*, for example, the First Circuit rejected a challenge to the transfer of adult immigration detainees to facilities far from their children, who remained in their homes. 510 F.3d 1 (1st Cir. 2007). The court reasoned that the "evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process." *Id.* at 22. Noting that substantive due process analysis is context-dependent, however, the court continued: "Were a substantial number of young children knowingly placed in harm's way, it is easy to imagine how viable claims might lie." *Id.* Similarly, in *E.O.H.C. v. Barr*, 434 F. Supp. 3d 321, 335–36 (E. D. Pa. 2020), *vacated and dismissed as moot sub nom. E.O.H.C. v. Att'y Gen. United States*, No. 20-1163, 2020 WL 2111302 (3d Cir. Apr. 20, 2020), the court held that a father had no constitutional right to be released from immigration detention when the Government released his daughter to her mother, who was also in the United States.[74] The court distinguished the family separation cases on the ground that DHS had "separated those family members itself. Its action was targeted at the family relationship. Moreover, none of those cases involved an asserted right to be

---

[74]    The Third Circuit dismissed the case as moot and vacated when DHS released the father.

released from detention.   Instead, the cases involved a right for families to be reunified, even if that reunification took place in detention." *Id.* at 336.

These are not cases in which "interference with the right to family integrity . . . was *incidental* to the government's legitimate interest" in immigration enforcement.   *Aguilar*, 510 F.3d at 22 (emphasis added).   These are cases in which Plaintiffs plausibly allege that the Government took the children into custody with their parents, intentionally and forcibly separated them, continued to detain them separately even when reunification was possible, and denied the parents and children information about and contact with each other—all in the service of causing them harm and deterring Central American family migration.   BYCC Compl. ¶¶ 19–146; JALC Compl. ¶¶ 19–127; RJP Compl. ¶¶ 21–153.   Even if the separation of families incidental to lawful immigration enforcement does not shock the conscience, the Family Separation Policy as conceived and unlawfully executed here does.   *K.O.*, 2023 WL 131411, at *9 (holding that allegations of unconstitutionality were plausible because they did not relate to the "the arrests or even the civil detention of parents generally" but to "the separation of families who are detained together").   Because the Complaints adequately allege a Due Process violation, the DFE does not apply.

> **b.   The   Equal   Protection   Clause   overrides   the Government's discretion.**

To plead an equal protection violation, Plaintiffs must allege that the Government intentionally discriminated against them as a result of their membership in a protected class.   *Hassan v. City of New York*, 804 F.3d 277, 294 (3d

Cir. 2015). Here, Plaintiffs allege facts that show discriminatory animus against the protected class of Central American families.

The Family Separation Policy was "purposefully 'designed to impose different burdens' on [Central American families] and . . . d[id] in fact have the intended adverse effect." *Id.* (quoting 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.4 (10th ed. 2012)); BYCC/G Compl. ¶¶ 19, 23–26, 38, 46, 60, 63, 65, 179–181. The Policy was piloted and extended only along the southern border, where Central American migration predominates. BYCC/G Compl. ¶¶ 19, 23–26, 38, 41, 46. Numerous public statements by officials involved in conceiving and launching the Policy explicitly focused on deterring the migration of Central American families. BYCC/G Compl. ¶¶ 24, 63. The officers who executed the Policy behaved with viciousness and contempt toward Plaintiffs and other victims. BYCC Compl. ¶¶ 100–106; JALC Compl. ¶¶ 88–90, 93–94; RJP Compl. ¶¶ 85–86, 88, 92, 96. And the families subjected to the Policy were in fact overwhelmingly from Central American countries. BYCC/G Compl. ¶ 181; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.").

Noting that enforcement was directed only at the southern border and not at other ports of entry, the Western District of Texas concluded that "Defendant's Zero Tolerance Policy plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants." *D.A.*, 2023 WL 2619167, at *8.

Given that plaintiffs pled "a possible violation of [their] equal protection rights," the court held that the Government could not claim the protection of the discretionary function exception. *Id.* The same holds true here.

### c. Plaintiffs are not required to plead that the constitutional violation was clearly established.

Despite Plaintiffs' more-than-plausible allegations of unconstitutionality, Defendant argues that the DFE applies because "the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited." Def.'s BYCC/G Br. at 21. In support, Defendant relies almost exclusively on cases involving absolute and qualified immunity for federal officers. *Id.* at 21–22 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999); and *Butz v. Economou*, 438 U.S. 478, 505 (1978)). This immunity doctrine is inapplicable under the FTCA.

Applying the "clearly established" requirement from the qualified immunity analysis to Plaintiffs' claims is inconsistent with the framework of the FTCA. Congress enacted the FTCA to waive its otherwise absolute sovereign immunity. Because "unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute," the general rule that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign" does not apply in FTCA cases. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006) (citations omitted). Instead, courts read the statute's exceptions as they are written and avoid restoring immunities the Government has forgone. *Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957) ("There is no

justification for this Court to read exemptions into the [FTCA] beyond those provided by Congress.  If the Act is to be altered that is a function for the same body that adopted it.").  To read the qualified immunity standard into the statute would "expand the discretionary function exception" beyond the bounds of the statute's language.  *A.F.P.*, 2022 WL 2704570, at *13.

Moreover, the qualified immunity standard arises from a different context and does not fit this one.  The courts developed the doctrine of qualified immunity to "shield an officer from *personal liability* when an officer reasonably believes that his or her conduct complies with the law."  *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (emphasis added).  The idea is to protect individual officers from "the expenses of litigation [and] the diversion of official energy from pressing public issues," and to avoid "the deterrence of able citizens from acceptance of public office."  *Harlow*, 457 U.S. at 814.  These concerns are inapposite where, as here, the United States is the defendant and personal liability is not at issue.

In this context, the FTCA establishes the scope of liability, and it provides that "[t]he United States shall be liable . . . in the same manner and to the same extent as a *private individual* under like circumstances."  28 U.S.C. § 2674 (emphasis added).  A private individual cannot claim qualified immunity.  The FTCA goes on to limit the Government's defenses to those based on "judicial or legislative immunity which otherwise would have been available to the employee" and to "any other defenses to which the United States is entitled."  28 U.S.C. § 2674.  Qualified immunity is not a judicial or legislative immunity, nor is it a defense available to the United States or

to any federal agency, but only to individuals.  *FDIC v. Meyer,* 510 U.S. 471, 485 (1994); *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994).

Defendant's argument notwithstanding, Def.'s BYCC/G Br. at 22, the Third Circuit's decision in *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019), does not require the importation of qualified immunity standards into the FTCA.  In *Bryan*, the court held that individual CBP officers were entitled to qualified immunity from a *Bivens* claim because the Fourth Amendment rights asserted were not clearly established at the time of the alleged search.  913 F.3d at 362–63; *see also Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  The court then held—without analysis—that in the absence of "clearly established constitutional rights, the FTCA claims also fail."  913 F.3d at 364.  In making this statement, the court appears to have relied on the plaintiffs' concession.  *Id.* (stating that *plaintiffs* argued that the DFE did not apply because the officers had "violated 'clearly established . . . constitutional rights of which a reasonable person would have known'") (citation omitted).  Plaintiffs here make no such concession.  Because the issue of the appropriate standard for pleading constitutional violations to defeat the DFE was neither briefed nor analyzed in *Bryan*, that decision is not controlling here.[75]

----

[75]    *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Ochoa-Salgado v. Garland*, 5 F.4th 615, 620 (5th Cir. 2021) ("[W]here a party concedes an issue and a panel fails to give it reasoned consideration, a ruling relying on that concession isn't an affirmation of the conceded proposition that operates as binding precedent.").

Recognizing that the qualified immunity standard does not apply, several district courts deciding FTCA family separation cases have rejected the Government's invitation to rely on it.  *E.g.*, *A.F.P.*, 2022 WL 2704570, at *13; *D.J.C.V.*, 605 F. Supp. 3d at 597; *F.R.*, 2022 WL 2905040, at *5; *K.O.,* 2023 WL 131411, at *9.  This court should follow their lead.

### 2. The federal definition of an "unaccompanied alien child" overrides the Government's discretion.

The Government has no discretion to render a child unaccompanied through forcible separation from a parent and then rely on that separation to designate the child as an "unaccompanied alien child."  Federal law defines an "unaccompanied alien child" as one who is under eighteen, lacks lawful immigration status, and has "no parent or legal guardian in the United States" who is "available to provide care and physical custody."  6 U.S.C. § 279(g)(2).  "[A] child is not 'unaccompanied'—and, therefore, neither a UAC nor properly within ORR's regulatory ambit—if a parent is physically present in the United States and, as a practical matter, is available to provide care and physical custody."  *Maldonado v. Lloyd*, No. 18 Civ. 3089, 2018 WL 2089348, at *5 (S.D.N.Y. 2018)[76]; *D.J.C.V.*, 605 F. Supp. 3d at 606–07 (collecting cases applying UAC definition).

Plaintiff parents were available to care for their children within the meaning of the federal definition.  Manuel, Leya, and Orlan each arrived in the United States with a parent who was not only available to provide care and physical custody but

---

[76]   While *Maldonado* signals an exception when a parent is in "custodial detention," *id.* at *5 n.6, that exception does not apply here for the reasons that follow.

who had done so throughout the child's life and who begged to be allowed to continue to do so.   BCYY Compl. ¶¶ 88, 92, 101–105; JALC Compl. ¶¶ 82, 88–90, 94; RJP Compl. ¶¶ 84–85, 96, 99.  The families' civil detention in immigration custody did not make Beatriz, Jacob, or Rafael "unavailable" for parenthood.  *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018) (ordering reunification of mother and sons and holding that right to family integrity survived even when parent was "lawfully detained in immigration custody"); *Ms. L.*, 310 F. Supp. 3d at 1148 (holding that court-ordered reunification would not interfere with the Government's "discretion in matters of release and detention").

The Government argues that it had discretion to designate the children as unaccompanied because it was detaining the parents "for prosecution" or "possible prosecution."  Def.'s BYCC/G Br. at 24.  But the facts as alleged contradict this assertion.  CBP could not detain Beatriz "for possible prosecution," Def.'s BCYY Br. at 24, because she violated no criminal law by entering the country at an authorized checkpoint and claiming asylum, and the Government did not prosecute her, BCYY Compl. ¶¶ 91–92; *cf.* 8 U.S.C. § 1325.  *Ms. L.*, 310 F. Supp. 3d at 1143 ("[A]lthough parents and children may lawfully be separated when the parent is placed in criminal custody, the same general rule does not apply when a parent and child present together lawfully at a port of entry seeking asylum.").  Similarly, the Government argues that it had discretion to separate Leya from Jacob because it was detaining him "for prosecution."  Def.'s JALC Br. at 24.  But the Government did not prosecute Jacob.  Here, as in related cases, "[t]he United States fails to explain how a parent

who is merely 'amenable' to prosecution—but has not been charged with a crime—is, for that reason, unavailable to care for his child." *A.P.F.*, 492 F. Supp. 3d at 995 n.3; *C.M.*, 2020 WL 1698191, at *3 n.4.  As to Rafael, whom the Government did prosecute, he was available to care for Orlan immediately upon his release from criminal custody, at which point father and son were both in CBP custody, less than an hour's drive apart.  RJP Compl. ¶ 106; *see W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1125–26 (N.D. Ill. 2018) (granting preliminary injunction to reunify fathers and children after fathers' release from criminal to immigration custody); *D.A.*, 2023 WL 2619167, at *9 (holding that continued separation after parent's release from criminal to immigration custody plausibly violates right to family integrity); *see also Jose L.P. v. Whitaker*, 431 F. Supp. 3d 540, 548 (D.N.J. 2019) (holding that UAC status is mutable and no longer applies when a parent becomes available to care for the child).

Plaintiff children were not "true unaccompanied minors within the meaning of the statute; they were rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants." *Jacinto-Castanon*, 319 F. Supp. 3d at 495 n.2.  In these circumstances, the designations were unlawful and therefore nondiscretionary.  The purpose of a UAC designation is to ensure the care and safety of "children who were apprehended *without their parents* at the border or otherwise." *Ms. L.*, Order Following Status Conf., No. 18-cv-0428 (S.D. Cal. July 10, 2018), ECF No. 101.  "The intricate web of statutory protections relating to UACs reflects Congress's unmistakable desire to protect that vulnerable group." *D.B. v. Cardall*, 826 F.3d 721, 738 (4th Cir. 2016).  It would be a perversion of this intent to hold that

the law authorizes CBP agents to designate children as UACs for the purpose of separating them from their parents, causing them harm, and deterring the migration of others like them.  Because the CBP officers lacked the legal authority to make the designations, the discretionary function exception does not apply.[77]

### 3. The *Flores* Settlement Agreement overrides the Government's discretion.

Government officials had no discretion to violate the *Flores* Settlement Agreement (FSA),[78] and their decisions to separate Plaintiff children from, and not to reunify them promptly with, their parents contravened the Agreement's central policy goals.

The *Flores* Agreement is binding on the Government's immigration agencies and "sets out nationwide policy for the detention, release, and treatment of minors" who are in immigration custody.  FSA ¶¶ 1, 9; *see also Flores v. Rosen*, 984 F.3d 720, 727 n.1 (9th Cir. 2020) (noting that the *Flores* Agreement applies to DHS and HHS). The Agreement provides an overarching directive that the Government must treat "all minors in its custody with dignity, respect and special concern for their vulnerability as minors."  FSA ¶ 11.  Further to this requirement, the "best interests"

---

[77]    As Defendant notes, Def.'s BCYY Br. at 24, one court, the District of Massachusetts, has held that the federal UAC definition "does not *forbid* family separation" when a parent has been detained.  *K.O.*, 2023 WL 131411, at *7.  This reasoning overlooks that the parents were placed in adult detention for the purpose of separating them from their children.  That cannot be a lawful purpose under a statute designed to ensure the protection of children who have no parent available to care for them.

[78]    *Flores v. Reno*, No. CV 85-4544 (C.D. Cal. Jan. 17, 1997) (FSA), https://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

of immigrant children must serve as the "paramount" consideration in detention and release decisions. *Flores v. Sessions*, No. CV 85-4544, 2018 WL 4945000, at *5 (C.D. Cal. July 9, 2018). Although the *Flores* Agreement provides parents "no affirmative release rights," *Flores v. Lynch*, 828 F.3d 898, 909 (9th Cir. 2016), it "expresses an explicit policy favoring the release of minors to their parent or legal guardian," *Ruiz ex rel. E.R. v. United States*, No. 13-1241, 2014 WL 4662241, at *7 (E.D.N.Y. Sept. 18, 2014) (citing FSA ¶ 14). The Agreement thus "creates a presumption in favor of release and favors family reunification." *Flores v. Lynch*, 828 F.3d at 903.

The *Flores* Agreement charges the Government's immigration agencies to take specific measures conducive to maintaining family unity. Officials must "make and record . . . prompt and continuous efforts . . . toward family reunification," which "shall continue so long as the minor is in" immigration custody. FSA ¶ 18. These agencies have "an affirmative obligation" to make "*individualized* determinations," based on a "review of the facts" for each child, whether and to whom the child's release is appropriate. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1066–67 (C.D. Cal. 2017), *appeal dismissed sub nom. Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019). Moreover, regulations in effect at the time of Plaintiffs' separations permitted immigration officials to release a minor "with an accompanying relative who is in detention" if other relatives were not available to assume care and custody of the child. *Id.* at 1064 (quoting 8 C.F.R. § 212.5(b)(3)(ii) as then in effect).

The *Flores* Agreement also governs the conditions of minors' detention, requiring facilities that are "safe and sanitary" and consistent with the agencies'

overriding concern for "the particular vulnerability of minors." FSA ¶ 12.A. Among other things, the agencies must provide minors in custody with "access to toilets and sinks," "drinking water and food as appropriate," "adequate temperature control and ventilation," and "contact with family members who were arrested with the minor." *Id.*; *see also A.E.S.E.*, 2022 WL 4289930, at *10–11 (holding that the Government officers had no discretion to deny plaintiff minor children "these basic requirements in light of . . . the *Flores* Agreement").

The Government's assertion that the *Flores* Agreement "does not specifically prescribe a course of action for DHS agents to take, and thus, does not remove the government's discretion," Def.'s BYCC/G Br. at 24, is irreconcilable with these mandatory terms. The Government had no discretion to fail to undertake an individualized review of the facts to determine whether it would be in Manuel's, Leya's, or Orlan's best interests to be released with their parents, to remain temporarily with their parents in detention, or to be released to an available, non-detained adult under Paragraph 14 of the *Flores* Agreement. *See Flores v. Sessions*, 394 F. Supp. 3d at 1064, 1067. Nor did the Government have discretion to violate Paragraph 12's specific requirement to provide adequate sanitation, sustenance, and temperature control to Manuel, Leya, and Orlan while they were in the Government's custody, or Paragraph 18's specific requirement to record prompt and continuous efforts to reunite Manuel, Leya, and Orlan with their parents after Government officers forcibly separated them. Because DHS and CBP officers flouted the *Flores* Agreement's mandates, the discretionary function exception does not apply.

Even if the Government's characterization of these specific directives as "general requirements" were accurate, Def.'s BYCC Br. at 24, the discretionary function exception cannot shield the Government from liability because its decision to separate parents and children en masse was too inhumane to have been grounded in public policy. *See Gaubert*, 499 U.S. at 322–23 (explaining that the discretionary function exception "protects only governmental actions and decisions based on consideration of public policy"). The *Flores* Agreement establishes "settled, legitimate priorities," *K.O.*, 2023 WL 131411, at *8, which include policies of treating immigrant children with dignity, acting in the children's best interests, and maintaining family unity. *See* FSA ¶ 11; *Flores v. Sessions*, 2018 WL 4945000, at *4; *Ruiz*, 2014 WL 4662241, at *7; *Flores v. Lynch*, 828 F.3d at 903. Despite these unambiguous priorities, the Government intentionally designed the Family Separation Policy to circumvent and frustrate its obligations under the *Flores* Agreement and separated Manuel, Leya, and Orlan from their parents based on nothing more than "the *in terrorem* effect it may have on others." *K.O.*, 2023 WL 131411, at *8 (quotation marks and citation omitted). This is "not a valid priority." *Id.* "[C]ertain decisions by government actors, though nominally discretionary, may pass a threshold of objective unreasonableness such that no reasonable observer would see them as susceptible to policy analysis." *Hajdusek v. United States*, 895 F.3d 146, 152 (1st Cir. 2018). The Government's forcible separation of Plaintiff children from their parents to deter other Central American families from migrating to the United States amounted to a

complete rejection of the policy interests integral to the *Flores* Agreement. Accordingly, the discretionary function exception does not apply.

### 4. DHS rules and internal agency standards override the Government's discretion.

Government officials had no discretion to violate internal agency rules that set the requisite standard of care and conditions of Plaintiffs' detention in CBP, ICE, or ORR custody.  BYCC Compl. ¶¶ 195–211; JALC Compl. ¶¶ 174–199; RJP Compl. ¶¶ 209–233.  An agency policy overrides the DFE when it "specifically prescribe[s] a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536.  If a federal officer or employee violates a mandatory policy, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Merando v. United States*, 517 F.3d 160, 165 (3d Cir. 2008) (quoting *Gaubert*, 499 U.S. at 324).

CBP's "Hold Room and Short Term Custody" policy ("Short-Term Custody Policy")[79] and National Standards on Transport, Escort, Detention, and Search ("TEDS Standards")[80] "govern CBP's interaction with detained individuals." *Rosa v. McAleenan*, No. 1:19-CV-00095, 2019 WL 5191095, at *4 (S.D. Tex. Oct. 15, 2019). These rules establish the "national policy for the short-term custody of persons

---

[79]     U.S. Dep't of Homeland Sec., U.S. Customs & Border Protection, Memorandum from David V. Aguilar to All Chief Patrol Agents, *Hold Rooms and Short Term Custody*          (June          2,          2008), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Hold%20Rooms%20and%20Short%20Term%20Custody%202008_1.pdf.

[80]     U.S. Customs & Border Protection, *National Standards on Transport, Escort, Detention,          and          Search*          (Oct.          2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

arrested or detained by Border Patrol Agents and detained in hold rooms . . . at facilities that are under the control of U.S. Customs and Border Protection." *Ruiz*, 2014 WL 4662241, at *7; BYCC/G Compl. ¶¶ 195–198.  The requirements are not merely "mandatory-sounding," Def.'s BYCC/G Br. at 24; they are mandatory.

The TEDS Standards require CBP officers to "consider the best interest of the juvenile at all decision points," TEDS § 1.6, and to "maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation," *id.* § 1.9; *see also id.* § 4.3 ("Generally, family units with juveniles should not be separated."), § 5.6 (same). Moreover, when children must be separated, "CBP should ensure parents have the opportunity to arrange for care of their children."  TEDS § 5.6.  In executing the Family Separation Policy, officers directly flouted these directives by separating Plaintiffs and similar family units en masse, without regard to operational feasibility. In fact, the separations posed overwhelming operational challenges that have left scores of families still separated today, six years later.  BYCC/G Compl. ¶¶ 57–59, 66–80.  Moreover, the separations were made without any inquiry into potential safety issues that might have necessitated removing the children from their parents and without giving the parents any opportunity to arrange for care for the children. BYCC Compl. ¶ 200; JALC Compl. ¶ 179; RJP Compl. ¶ 214.

The TEDS Standards require CBP officers to "treat all individuals with dignity and respect" and to carry out their duties "in a nondiscriminatory manner, with respect to all forms of protected status under federal law" and with "full respect for

individual rights including equal protection under the law [and] due process." TEDS § 1.4.  They "must speak and act with the utmost integrity and professionalism" and "conduct themselves in a manner that reflects positively on CBP at all times." *Id.* § 1.2.  Sticking a three-year-old in a jeep while he screams and thrashes as his mother stands helplessly outside, BYCC Compl. ¶¶ 102–105, swearing at a desperate father whose daughter has just been yanked from his arms, JALC Compl. ¶¶ 89–90, 94, and threatening to shoot a father and son who arrived in search of humanitarian protection, RJP Compl. ¶¶ 85–86, fall far short of these standards, as does making Central American immigrants the primary target of these indignities, *supra* Point I.B.1.b.  Moreover, male officers violated a clear proscription on cross-gender searches when they twice conducted pat-downs on Leya.  TEDS § 3.4; JALC Compl. ¶¶ 83–84.

The rules also prescribe, often with great specificity, the provision of nutrition, bedding, and hygiene for detainees.  "Detainees will be provided snacks and juice every four hours."  Short-Term Custody Pol. § 6.8.  Full meals must be provided to juveniles "at least every six hours," and "two of the three meals must be hot."  *Id.*  In addition, children must "have regular access to snacks, milk, or juice at all times." *Id.*  Yet Manuel and Orlan were denied adequate nutrition.  BYCC Compl. ¶¶ 94–95, 97; RJP Compl. ¶¶ 90, 142, 145.  Although officers are to maintain hold rooms "within a reasonable and comfortable [temperature] range," TEDS § 4.7, and must offer "clean bedding," Short-Term Custody Pol. § 6.11, all Plaintiffs complained of excessive cold, BCYY Comp. ¶¶ 94–95; JALC Compl. ¶¶ 85–87; RJP Compl. ¶ 87, and none received bedding other than a foil sheet, if that, BCYY Compl. ¶ 94; JALC Compl. ¶ 86; RJP

Compl. ¶¶ 91, 94, 99.  As to hygiene, CBP failed to keep cells and bathrooms "cleaned and sanitized," Short-Term Custody Pol. § 6.16; TEDS § 4.7, and provided no "diapers and baby wipes" for Manuel, TEDS § 4.11; Short-Term Custody Pol. § 6.10.  JALC ¶ 86; RJP Compl. ¶ 87; BYCC Compl. ¶ 97.

When Plaintiffs moved from CBP to ICE and ORR custody, the violations continued.  The ORR Policy Guide[81] requires the agency to ensure that children have regular contact with safe family members, and staff must respond to family members who contact ORR facilities.  ORR Pol. Guide §§ 1.5.1, 3.3.10.  The Performance-Based National Detention Standards (PBNDS)[82] give ICE detainees who are indigent and lack sufficient funds in their accounts for ten or more days the right to "request a call to immediate family . . . in personal or family emergencies or on an as-needed basis."  PBNDS § 5.6(V)(E)(3).  Yet ORR failed to establish contact between Jacob and Leya and did not return his many calls.  JALC Compl. ¶¶ 113–114.  Moreover, ICE neither informed any of the parents of their right to request free calls nor facilitated any such calls with their children.  BCYY Comp. ¶ 114, 123; JALC Compl. ¶ 99; RJP Compl. ¶¶ 125–126.

---

[81]    U.S. Dep't of Health & Hum. Servs., Off. of Refugee Resettlement, *ORR Guide: Children Entering the United States Unaccompanied* (Apr. 13, 2022), https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied [https://web.archive.org/web/20220607205416/https://www.acf.hhs.gov/orr/policy-guidance/children-entering-united-states-unaccompanied].

[82]    U.S. Immigr. & Customs Enf't, *Performance-Based Nat'l Detention Standards 2011* (revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

Courts considering similar violations of the standards that govern these agencies have held that the DFE did not apply because the officers lacked discretion to ignore their professional obligations. *A.E.S.E.*, 2022 WL 4289930, at \*10–11 (Government officers had no discretion to deny plaintiff children certain "basic requirements" under the TEDS Standards and *Flores* Agreement, including adequate food, clean cells and hygiene products, and non-punitive temperatures); *Ruiz*, 2014 WL 4662241, at \*7–8 (DFE did not shield CBP officers from liability for their treatment of an unaccompanied minor because they "failed to follow the explicit policies and procedures of the *Flores* Agreement and the CBP's internal policies," where, among other things, CBP officers failed to provide the juvenile detainee with "a meal . . . every six hours" and "a blanket or pillow in the cold holding area"). Likewise, here, the officers' disregard of the governing agency standards deprives the Government of the protection of the DFE.

## C.   The Due Care Exception Does Not Apply.

The prevailing test to determine whether the due care exception applies is set forth in *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005). *E.g.*, *C.D.A. v. United States*, No. 21-469, 2023 WL 2666064, at \*15 (E.D. Pa. Mar. 28, 2023) (adopting *Welch* test). Under *Welch's* two-prong test, the Government must show that: (1) *a statute or regulation* "specifically pr[e]scribes a course of action for an officer to follow," and (2) "the officer exercised due care in following the dictates of that statute or regulation." 409 F.3d at 652 (citing *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir. 1995)). "Otherwise stated, the due care exception applies only when an official was 'reasonably executing the mandates of' a statute or regulation." *A.P.F.*, 492 F. Supp.

-56-

3d at 995 (quoting *Welch*, 409 F.3d at 651).  The Government fails to satisfy both prongs of the test.[83]

Here, as in similar cases, "[t]he United States cites no statute or regulation mandating the separation."  *E.g.*, *C.M.*, 2020 WL 1698191, at *3.  Instead, the Government mischaracterizes Plaintiffs' claims as "related to the decision to transfer [the children] to the custody of ORR," Def.'s BYCC/G Br. at 26, and argues that its adherence to the "statutory command [regarding transfer] cannot form the basis of an FTCA claim," *id.* at 27–28 (citing 8 U.S.C. §1232(b)(3)).  But the Government was not subject to any "command" to transfer the children to ORR custody until it unlawfully separated them from their parents and designated them as UACs.  Federal law did not require (or even permit) the Government to designate Plaintiff children as "unaccompanied," *supra* Point I.B.2, and the Government cannot rely on that improper designation to invoke the due care exception based on a statute that mandates the swift transfer of actual unaccompanied children.

Because Plaintiffs' separation was driven by a *policy*, rather than by any statute or regulation, the due care exception is inapplicable.  *A.P.F.*, 492 F. Supp. 3d at 996 (due care exception inapplicable because CBP officers' actions concerning family separations were "conducted pursuant to executive policy" and "not pursuant

---

[83]     The Third Circuit has repeatedly held that the Government bears the burden to show that the discretionary function exception applies.  *See, e.g.*, *S.R.P.*, 676 F.3d at 333 n.2 (noting that the Third Circuit's allocation of the burden of proof to the Government is consistent with the approaches of the Sixth, Seventh, and Ninth Circuits); *Merando,* 517 F.3d at 164.  It is hard to imagine why a different standard would apply with respect to the due care exception.

to any statute or regulation"); *Nunez Euceda*, 2021 WL 4895748, at *4 (same).  As the

court in *K.O.* explained,

> The TVPRA [Trafficking Victims Protection Reauthorization Act] might
> mandate a transfer to ORR after that initial separation, *but the
> government cannot hide behind the DCE when it triggers a statutory
> scheme with conduct not mandated by the statute.*  Furthermore, nothing
> in the TVPRA forbids communication or the relay of accurate
> information about a parent's whereabouts to a child. Therefore, the DCE
> does not apply to the alleged conduct.

*K.O.*, 2023 WL 131411, at *6 (emphasis added).

The Government's argument in support of the applicability of the due care

exception relies entirely on an outlier decision in the District of New Mexico,

*S.E.B.M.*, 2023 WL 2383784, at *15–16 (finding due care exception applicable because

plaintiff child was separated from her father pursuant to his prosecution for illegal

entry).  BCYY/G Br. at 28.  This reliance is misplaced.  Unlike the plaintiffs in

*S.E.B.M.*, neither Jacob nor Beatriz was prosecuted, and Beatriz was not even

"amenable" to prosecution.  Nor does the result change when considering Rafael's

prosecution for misdemeanor illegal entry.  Orlan was no longer a UAC once Rafael

was released from criminal custody, *supra* Point I.B.2, and that occurred *before* the

Government shipped Orlan off to a distant ORR facility.  RJP Compl. ¶ 106.  Thus,

none of the transfers here was warranted, let alone required.[84]

---

[84]   Even if Orlan had been transferred while Rafael was in criminal custody, the
due care exception would not apply.  The decision to prosecute was discretionary, not
statutorily mandated.  Therefore, children separated during their parents' criminal
custody became "unaccompanied only because of the Government's fulfillment of its
zero-tolerance policy by detaining [their parents]," rather than pursuant to a statute
or regulation.  *C.D.A.*, 2023 WL 2666064, at *15.

Further, the exception applies only if the officers exercise due care, which "implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956). The inquiry is one of reasonableness. *See Hydrogen Tech. Corp. v. United States*, 831 F.2d 1155, 1161 (1st Cir. 1987). Defendants' actions were far from reasonable. In fact, they were dehumanizing and cruel.[85]

For these reasons, as Defendant admits, Def.'s BYCC/G Br. at 28 n.8, nearly every court across the country has rejected the argument that the due care exception applies to shield the conduct at issue here.[86] Accordingly, this exception does not shield the Government from liability.

### D.   Plaintiffs' Claims Have Private-Person Analogs.

The Government argues that Plaintiffs' claims are barred because there is no "private person analog" to the conduct alleged in this case. Def.'s BYCC/G Br. at 28–

---

[85]   The Government does not challenge the sufficiency of Plaintiffs' pleadings with respect to this second *Welch* prong.

[86]   *A.E.S.E.*, 2022 WL 4289930, at *13–14; *A.F.P.*, 2022 WL 2704570, at *14; *A.I.I.L.*, 2022 WL 992543, at *4–5; *A.P.F.*, 492 F. Supp. 3d at 995; *B.A.D.J.*, 2022 WL 11631016, at *4; *C.D.A.*, 2023 WL 2666064, at *15; *C.M.*, 2020 WL 1698191, at *3; *D.J.C.V.*, 605 F. Supp. 3d at 597–98; *E.S.M.*, 2022 WL 11729644, at *5; *Fuentes-Ortega*, 2022 WL 16924223, at *4; *I.T.*, No. 22-cv-05333, slip op. at 13–14; *Nunez Euceda*, 2021 WL 4895748, at *4; *Wilbur P.G.*, 2022 WL 3024319, at *5. The courts that apply the due care exception generally do so to immunize a child's transfer to ORR custody *while the parent was in criminal custody. E.g.*, *D.A.*, 2023 WL 2619167, at *11 ("Plaintiffs are barred from challenging Defendant's discrete decision to transfer D.A. and A.A. to ORR custody *once Padilla-Gonzales was incarcerated.*"); *S.E.B.M.*, 2023 WL 2383784, at *15. Neither Beatriz nor Jacob was ever in criminal custody, and Orlan was placed in ORR custody two days after Rafael's release from jail. Decl. of James S. De La Cruz ¶ 16 (Mar. 6, 2023), ECF No. 14-2.

31.  Numerous courts reviewing parallel cases have considered and properly rejected this argument.[87]

To establish subject matter jurisdiction under the FTCA, Plaintiffs must show that "a private individual under like circumstances would be liable under state law." *United States v. Muniz*, 374 U.S. 150, 153 (1963); *see also* 28 U.S.C. § 2674.  The words "like circumstances" do not mean "the same circumstances," and courts are required "to look further afield" to find analogous torts relating to the government activity at issue.  *United States v. Olson*, 546 U.S. 43, 46 (2005) (instructing lower court on remand to look for analogous torts by private individuals who undertake inspections in FTCA case arising out of federal mine inspectors' negligence).  This is so even when the challenged conduct involves "uniquely governmental functions."  *Id.*; *see also Indian Towing Co. v. United States*, 350 U.S. 61, 64–65 (1955) (same).  Although the Government relies on *Olson*, it fails to undertake the private analog analysis prescribed by the Court.  Indeed, it does not even mention the state torts Plaintiffs pled, let alone analyze whether they are based on "like circumstances."

---

[87]    *See, e.g., K.O.*, 2023 WL 131411, at *11–12 (finding private analogs under Texas and/or Michigan law for separated families' claims for IIED, negligent infliction of emotional distress, interference with parental rights, false imprisonment, assault and battery, and loss of consortium); *A.F.P.*, 2022 WL 2704570, at *9–10 (finding private analogs under Texas law for negligence, IIED, and abuse of process); *D.A.*, 2023 WL 2619167, at *10–13 (finding private analogs under Texas law for child abduction, breach of fiduciary duty, negligence, IIED, assault and battery, loss of consortium, and abuse of process); *I.T.*, No. 22-cv-05333, slip op. at 14–15 (finding private analogs for IIED, negligence, abuse of process, negligent supervision/breach of fiduciary duty, loss of consortium, and intentional interference with custodial relations).

Instead, the Government makes a blanket assertion that "governmental decisions concerning immigration have no private-party analog." Def.'s BYCC/G Br. at 30. In support, the Government relies on two types of cases: (1) challenges to the denial or withdrawal of an immigration status or benefit (e.g., denial of status adjustment application, naturalization application, or withdrawal of citizenship),[88] and (2) challenges to federal detention.[89] But Plaintiffs are not challenging decisions on their eligibility for an immigration status, "which only the federal government is capable of altering." *Liranzo v. United States*, 690 F.3d 78, 96 (2d Cir. 2012). Nor are Plaintiffs challenging the decisions to detain them.[90] In sum, the cases the Government relies upon are too far afield to be instructive, and they neither address nor foreclose the availability of analogs in state tort law for injuries to individuals in the custody of immigration officials.

"The fact that Defendant has exclusive authority to enforce immigration law does not give it carte blanche to commit torts against migrants in its custody."

---

[88]     Def.'s BYCC/G Br. at 30 (citing *Bhuiyan v. United States*, 772 F. App'x 564 (9th Cir. 2019); *Elgamal v. Bernacke*, 714 F. App'x 741 (9th Cir. 2018); *Omoniyi v. Dep't of Homeland Sec.*, No. 10-1344, 2012 WL 892197 (S.D.N.Y. Mar. 13, 2012); *Mazur v. United States*, 957 F. Supp. 1041 (N.D. Ill. 1997); and *Akutowicz v. United States*, 859 F.2d 1122 (2d Cir. 1988)).

[89]     Def.'s BYCC/G Br. at 31 (citing *McGowan v. United States*, 825 F.3d 118, 127 (2d Cir. 2016); *Buzzanca v. D.C.*, No. 18-2893, 2021 WL 796275 (D.D.C. Mar. 2, 2021); *Portillo v. United States*, No. 17-cv-00394, 2018 WL 523363 (D. Nev. Jan. 22, 2018), *aff'd*, 741 F. App'x 415 (9th Cir. 2018)).

[90]     In addition to its misplaced reliance on factually distinguishable cases, the Government is incorrect in its assertion that there can be no private analog to federal detention. *See Liranzo*, 690 F.3d at 94–95 (finding "proper analogy" for immigration detention "seems to . . . be . . . a so-called 'citizen's arrest'").

*E.S.M.*, 2022 WL 11729644, at *3 (finding private analogs in family separation case because "the conduct for which Defendant is being sued in this case, while related to conduct only the Government may perform, is not beyond the scope of state tort law"). Accordingly, courts have routinely found private state analogs for tortious conduct by immigration officials.[91] And, as the Government notes, Def.'s BYCC/G Br. at 31 n.9, courts have recognized private analogs to the precise conduct challenged here—the creation and implementation of the Family Separation Policy.

Plaintiffs have satisfied the jurisdictional requirement of showing that the Government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, under the tort claims they plead under Texas and Michigan law. For a full analysis, see *infra* Point II.

## E. Defendant's Other Jurisdictional Challenges Also Fail.

### 1. The Complaints plead common law torts, not "constitutional torts."

Defendant cannot justify dismissal of the Complaints by recasting Plaintiffs' claims as "constitutional torts." Plaintiffs agree that constitutional violations are not cognizable under the FTCA. This is why Plaintiffs pled tort claims under Texas and

---

[91]     *See, e.g., Avalos-Palma v. United States*, No. 13-5481, 2014 WL 3524758, at *12 (D.N.J. July 16, 2014) (private analog doctrine did not bar claims arising from wrongful deportation); *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1300–01 (M.D. Ga. Mar. 31, 2012) (negligence claim for arrest and confinement and negligent infliction of emotional distress against ICE officers cognizable under state law); *Roe v. United States*, No. 18-CV-2644, 2019 WL 1227940, at *5–6 (S.D.N.Y. Mar. 15, 2019) (negligence and intentional and negligent infliction of emotional distress claims based on disregard of statutory duty viable under New York law against immigration officials).

Michigan law arising from the acts and or omissions of federal employees.  BYCC

Compl. ¶¶ 212–262; JALC Compl. ¶¶ 200–249; RJP Compl. ¶¶ 234–272.

 In focusing on Plaintiffs' argument that the Constitution overrides the DFE,

Def.'s BYCC Br. at 32, the Government:

> conflates the difference between a cause of action and a basis for
> immunity from a cause of action.  Here, Plaintiffs are asserting causes
> of action based on state tort law not constitutional law.  The issue of
> constitutional rights is relevant only with respect to whether Defendant
> had discretion to act as it did and, therefore, whether it retains
> immunity from suit regarding Plaintiffs' state law causes of action.

*D.A.*, 2023 WL 2619167, at *9; *see also Nunez Euceda*, 2021 WL 4895748, at *3–4;

*A.E.S.E.*, 2022 WL 4289930, at *9; *see also Loumiet v. United States*, 828 F.3d 935,

945-46 (D.C. Cir. 2016) ("A plaintiff who identifies constitutional defects in the

conduct underlying her FTCA tort claim—whether or not she advances a *Bivens* claim

against the individual official involved—may affect the availability of the

discretionary-function defense, but she does not thereby convert an FTCA claim into

a constitutional damages claim against the government . . . ."); *Dalal v. Molinelli*, No.

20-cv-1434, 2021 WL 1208901, at *10 n.12 (D.N.J. Mar. 30, 2021) ("The fact that a

constitutional tort is not a cognizable claim [under the FTCA] does not mean that a

plaintiff cannot bring a state tort law claim against the federal government based on

identified constitutional defects.").  As more fully explained in the Rule 12(b)(6)

section below, Plaintiffs adequately plead the tortious conduct underlying each of

their causes of action.

2.      **The Complaints plead common law torts based on the misconduct of federal employees, not "systemic torts."**

Apparently conceding that the FTCA claims are in fact torts (not constitutional violations), the Government next argues that the Plaintiffs improperly pled "systemic torts."  The FTCA permits a plaintiff to sue the United States for damages arising from torts committed by "any employee of the Government while acting within the scope of his [or her] office or employment . . . ."  28 U.S.C. § 1346(b)(1); *Vanderklok v. United States*, 868 F.3d 189, 201 (3d Cir. 2017).  Nevertheless, the statute specifies that the United States is the proper Defendant.  28 U.S.C. § 1346(b)(1); *see also CNA v. United States*, 535 F.3d 132, 138 n.2 (3d Cir. 2008).

The Government argues that Plaintiffs brought "systemic" claims against the Government rather than claims based on the direct liability of federal employees.  Def.'s BYCC Br. at 34.  This argument finds support in neither the law nor the Complaints.

The initial cases the Government cites stand for the proposition that plaintiffs in FTCA cases must plead torts against federal employees rather than against federal agencies or entities.  In *Daniels v. United States*, No. 20-cv-3893, 2021 WL 2327856 (E.D. Pa. June 1, 2021), for example, the court dismissed a claim of "corporate negligence" against a Veterans Administration Hospital for failure to diagnose plaintiff's lung cancer but retained a negligence claim arising from the misdiagnosis allegedly made by medical personnel at the hospital.  Similarly, in *Adams v. United States*, the court held that corporate entities could not be certified for immunity from tort claims under the FTCA, 28 U.S.C. § 2679(b)(1), because the immunity provision

-64-

applies to natural persons and not to corporations, 420 F.3d 1049, 1052–55 (9th Cir. 2005).

Given that these cases do not actually support its argument, the Government relies primarily on *Lee v. United States*, No. CV 19-08051, 2020 WL 6573258 (D. Ariz. Sept. 18, 2020). In *Lee*, the plaintiff alleged that numerous federal employees "collectively failed" to enforce federal suicide prevention regulations or train corrections staff on the regulations, which purportedly contributed to a prisoner's suicide. 2020 WL 6573258, at *5. The court recognized that the Ninth Circuit decision in *Adams*, 420 F.3d at 1052–55, "is not directly on point here" because the plaintiff in *Lee* did not make a claim against a "corporate entity." 2020 WL 6573258, at *7. Nevertheless, the court concluded that the FTCA provision hinging liability on the torts of federal employees requires a plaintiff to make "specific allegations regarding the roles and responsibilities of individual federal employees, how each employee breached his or her duties of care, and how their negligent conduct caused . . . harm." *Id.* This enhanced pleading requirement rests on a misreading, or at minimum an overreading, of *Adams* and contradicts the governing standard set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (requiring "enough facts to state a claim to relief that is plausible on its face"). Having set the bar higher than the law warrants, the court found the plaintiff's allegations "too vague and conclusory to state an underlying negligence claim." *Lee*, 2020 WL 6573258, at *7.

Because of its legal deficiencies, its factual inapplicability, or both, the Government's theory of "systemic" torts has not persuaded other courts to dismiss

FTCA challenges in the context of family separation.  In *A.F.P. v. United States*, for example, the Eastern District of California held that the Government had "not provided a sound legal basis" for dismissal based on "systemic torts" because the cases it cited (the same ones it cites here) were irrelevant, and the complaint pled adequate facts to support tort claims against federal employees in any event.  2022 WL 2704570, at *18.  In *K.O.*, the District of Massachusetts referred to the theory as "novel" and held that the complaint largely satisfied the requirement of pleading "the acts of specific officers."  2023 WL 131411, at *12.[92]  Insofar as the Government objects to Plaintiffs' failure to name many of the officers the Complaints reference, that issue can and should be resolved through discovery and not on a motion to dismiss.  *Wilbur P.G.*, 2022 WL 3024319, at *6; *see also E.S.M.*, 2022 WL 11729644, at *2; *C.D.A.*, 2023 WL 2666064, at *17; *I.T.*, No. 22-cv-05333, slip op. at 16.

### 3.    The independent contractor exception does not bar Plaintiffs' claims.

Defendant asks the Court to dismiss any claims premised on the conditions that certain Plaintiffs experienced while housed at facilities "run by contractors, not by the federal government," including the ORR contract facilities where Manuel, Leya, and Orlan were detained.  Def.'s BYCC Br. at 37; *see also* Def.'s RJP Br. at 36;

---

[92]    *See also B.A.D.J.*, 2022 WL 11631016, at *5; *C.D.A.*, 2023 WL 2666064, at *17; *E.S.M.*, 2022 WL 11729644, at *2; *F.R.*, 2022 WL 2905040, at *3–4; *Fuentes-Ortega*, 2022 WL 16924223, at *5; *I.T.*, No. 22-cv-05333, slip op. at 15–16; *Wilbur P.G.*, 2022 WL 3024319, at *6.

JALC Br. at 7 n.5.[93]  While Defendant is correct that the United States is generally not liable under the FTCA for the acts of a contractor,[94] it fails to identify any claims in the Complaints where this exception would apply.

Plaintiffs pled an array of tortious acts that preceded the minor Plaintiffs' placements in ORR-contracted facilities, including the promulgation of the Policy and its enforcement against them.  BYCC Compl. ¶¶ 19–80, 101–106; JALC Compl. ¶¶ 19–90; RJP Compl. ¶¶ 21–82, 95–100, 106.  The Complaints detail additional tortious conduct that occurred after the ORR placements, including the failures to provide information to the separated family members and facilitate communication between them, BYCC Compl. ¶¶ 107, 109, 114, 125–129; JALC Compl. ¶¶ 94–95, 99, 105, 108, 113; RJP Compl. ¶¶ 113, 115–116, 122, 124–126, 133, and the mishandling of two reunifications, JALC Compl. ¶¶ 119–120; RJP Compl. ¶¶ 137–145.  Plaintiffs attribute much of this tortious conduct to federal employees at the facilities housing the separated parents, which were run by ICE, and to federal employees responsible for reunifying separated families, who worked for ICE and ORR.  Accordingly, while staff at purportedly independently run ORR contract facilities may have engaged in

---

[93]    Defendant has not produced evidence that Bethany Christian Services was an ORR contractor at the time Leya was detained there.  Plaintiffs reserve the right to conduct discovery on this issue.

[94]    The exception does not apply when the United States "controls the physical conduct of the contractor in performance of the contract."  *Logue v. United States*, 412 U.S. 521, 527 (1973).

some additional misconduct, Plaintiffs' claims target the actions of federal employees and, therefore, the independent contractor exception poses no bar.[95]

## II. PLAINTIFFS HAVE ADEQUATELY PLED CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

### A. Standard of Review

When reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis*, 824 F.3d at 341 (citing *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)). The Complaint must state a facially plausible claim for relief by including "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mayer v. Belichick*, 605 F.3d at 230 (citations omitted). The Court considers "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Id.*

---

[95]    Even if Plaintiffs were seeking redress for abuse or other wrongful acts that occurred while they were held at facilities operated by contractors, at least one court has held that the independent contractor exception does not apply where the gravamen of a plaintiff's complaint is a challenge to the Government's policy and practice of separating families. *See A.P.F.*, 492 F.Supp.3d at 997 (declining to apply the independent contractor exception where the complaint "traces th[e] harm back to CBP officials' separation of Plaintiff families" because, "[h]ad the families remained intact, no foster-care abuse would have occurred").

**B.** **The Allegations in the BYCC and RJP Complaints Support Liability Under Texas Law.[96]**

**1.** **Texas privileges are inapplicable to Plaintiffs' state tort law claims.**

The Government contends that it cannot be held liable on any of Plaintiffs' claims because the conduct challenged in the Complaints "was privileged under Texas law and federal immigration statutes" and is therefore not tortious. *See* Def.'s BYCC/G Br. at 38. This argument fails for two reasons: first, the Government stands in the shoes of a private person when liability is assessed under the FTCA and it therefore cannot cloak itself in privileges afforded to state officials; second, even if the Government were able to invoke privileges afforded to law enforcement officers under Texas law, none applies to the unlawful conduct alleged in the Complaints.

In seeking dismissal under Rule 12(b)(1), the Government first asserts that the FTCA "requires a court to look at the state-law liability of private entities, not to that of public entities" when assessing liability under the FTCA. Def.'s BYCC/G Br. at 29 (quoting *Olson*, 546 U.S. at 45). Ten pages later, in its arguments under Rule 12(b)(6), the Government pivots and attempts to skirt responsibility by asserting privileges available only to public officials. Def.'s BYCC/G Br. at 38–39. In doing so, the Government overlooks the Supreme Court's holding in *Olson* that the United States can be liable in tort only "in the same manner and to the same extent as a *private individual*." *Olson*, 546 U.S. at 47 (emphasis added) (quoting 28 U.S.C. § 2674).

---

[96]    This section addresses the claims of Beatriz, Manuel, Rafael, and Orlan, who plead under Texas law. Michigan law applies to the claims of Jacob and Leya, *infra* Point II.B.1., but their claims also survive under Texas law.

The FTCA claim in *Olson* involved allegations that federal mine inspectors' negligence caused a mine to collapse and individuals to suffer injuries.  *Id.* at 45. Because mine inspection is a "uniquely governmental function," the Ninth Circuit reasoned that courts should look to how liability is imposed on state and municipal entities under local law.  *Id.* at 46.  The Supreme Court considered and rejected this approach because using state or municipal employees as the analog in an FTCA case would "read[] into the Act something that is not there."  *Id.* at 45.  The Court explained that the words of the FTCA "mean what they say": the United States is to be liable "'under circumstances' where local law would make a '*private person*' liable in tort."  *Id.* (citing 28 U.S.C. § 1346(b)(1)).  The Court reiterated that it had "consistently adhered to this 'private person' standard," even when "uniquely governmental functions" were at issue, *id.* at 46, and went on to instruct the Ninth Circuit on remand to look for an analogy in the context of "private persons who conduct safety inspections," *id.* at 47 (citation omitted).

Despite *Olson*'s directive, and even though the FTCA plainly states that it requires adherence to the private person standard of liability, a few courts have carved out a narrow exception allowing the Government to invoke state law privileges available to law enforcement and first responders.  *See, e.g.*, *Villafranca v. United States*, 587 F.3d 257, 262 (5th Cir. 2009) (applying Texas civil privilege defense for "law enforcement agents . . . using reasonable force to make a lawful arrest" in FTCA case alleging that federal agent's conduct constituted assault); *Hernandez v. United States*, No. 17-CV-00087, 2018 WL 4103015, at *4–5 (S.D. Tex. July 2, 2018) (applying

privileges afforded through state emergency vehicle statute to excuse negligent conduct in FTCA case brought against federal emergency vehicle operators).

The Third Circuit has not addressed whether state law privileges afforded to public officials apply in an FTCA case, but the Supreme Court considered and answered that question in *Olson*.[97]  While *Olson* did not involve law enforcement officers and this case does, the Supreme Court's plain reading of the FTCA remains controlling.  If Congress had intended certain categories of employees to retain the privileges they are afforded as public officials, it would have incorporated those protections into the FTCA.  To the contrary, Congress created a special exemption within the FTCA to hold the Government *accountable* for intentional torts committed by law enforcement officers.  Though generally exempted from liability under the FTCA for intentional torts, the United States remains liable for claims arising from certain intentional torts (including assault and battery and abuse of process) committed by "investigative or law enforcement officers," defined as those with authority "to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).  This explicit waiver of immunity for the

---

[97]     One court in the District of New Jersey found that the "special prerogative of law enforcement officers to use force while executing their obligations to search or arrest" must be considered in an FTCA case alleging excessive force.  *Hanson v. United States*, 712 F. Supp. 2d 321, 328–29 (D.N.J. 2010) (applying "reasonableness" test to Bureau of Prison officers' actions and finding that they employed unreasonable force against the plaintiff).  Notably, all parties in that case agreed that the applicable standard should be the "reasonableness" test used in New Jersey excessive force cases and that a law enforcement privilege would apply.  *Id.* at 326.  Plaintiffs here make no such concession and disagree with the *Hanson* court's finding that *Olson* can be narrowly construed to permit a special exception for law enforcement officers.

intentional torts of federal law enforcement officers prevents Defendant from cloaking itself in local privileges to immunize their misconduct.  Accordingly, the Government cannot assert state privileges as a matter of law.

But even if the Government has a right to invoke state law privileges, such privileges are not unlimited, and the Government has identified no state privilege and cited no case that excuses the kind of reprehensible conduct alleged here.  The plaintiffs in *Caban v. United States*, 728 F.2d 68 (2d Cir. 1984) and *Tovar v. United States*, No. 98-CV-1682, 2000 WL 425170 (N.D. Tex. April 18, 2000), *aff'd,* 244 F.3d 135 (5th Cir. 2000), filed FTCA actions alleging state false imprisonment claims arising from their immigration detentions, and those courts dismissed the claims because they found the immigration officers acted with legal authority when they detained the plaintiffs.  Unlike the plaintiffs in *Caban* and *Tovar*, Plaintiffs here do not challenge their detention or bring false imprisonment claims or any other claims that contain elements that privilege the conduct of immigration officers acting under the authority of law.  To the contrary, the Complaints allege that the Government had *no legal authority* to forcibly separate Plaintiffs and that it did so for illegitimate punitive purposes.  *See* BYCC Compl. ¶¶ 179–182, 247; JALC Compl. ¶¶ 157–160; RJP Compl. ¶¶ 193–196.  No privilege can apply under such circumstances. Unsurprisingly, the United States District Court for the Eastern District of Pennsylvania dismissed the Government's identical argument in an analogous case. *C.D.A.*, 2023 WL 2666064, at *22 (holding that the Government's reliance on *Caban* and *Tovar* was "misguided" in case challenging the Family Separation Policy where

-72-

plaintiffs did not bring a false imprisonment claim or any other claim that would invoke a Texas privilege for the conduct pled).

Defendant is further mistaken in its assertion that the Texas use-of-force privilege bars Plaintiffs' assault and battery claims. Def.'s BYCC Br. at 54–55; Def.'s JALC Br. at 53–54. Texas Penal Code §9.51(a) provides a defense if the use of force by a "peace officer" was "immediately necessary to make or assist in making an arrest." This is the only state law enforcement privilege identified by the Government, and it does not apply here. Plaintiffs' assault and battery claims stem from conduct that occurred after they were in custody. Abusive conduct that takes place after victims are in custody is not "immediately necessary" to carry out an arrest, and thus the use-of-force privilege is not applicable. *See Lozano v. Ortega*, No. 14-CV-239, 2014 WL 6611595, at *13 (W.D. Tex. Nov. 19, 2014) (finding use-of-force privilege unavailable to law enforcement officer who assaulted victim after he was handcuffed and subdued). Moreover, if an officer uses more force than is reasonable, "he exceeds his statutory authority." *See Ryser v. State*, 453 S.W.3d 17, 27 (Tex. App. 2014) (affirming conviction of police officer who struck and kneed victim with more force than immediately necessary to effectuate arrest). The Government had no statutory authority to subject Plaintiffs to the abuse of force at issue here, and accordingly, no privilege shields this conduct.

### 2.  The allegations support each of the Texas torts pled.

#### a.  Intentional infliction of emotional distress

To plead a claim for intentional infliction of emotional distress (IIED), a plaintiff must allege "1) the defendant acted intentionally or recklessly, 2) the conduct

was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (adopting formulation of IIED from Restatement (Second) of Torts § 46 (Am. L. Inst. 1965)); *Johnson v. Merrell Dow Pharm., Inc.*, 965 F.2d 31, 33 (5th Cir. 1992). Plaintiffs adequately pled each element.

Defendant's sole challenge to Plaintiffs' IIED claim rests on whether the conduct in question was "extreme or outrageous." BYCC/G-Br. at 41. Texas courts evaluating this standard consider "the entire set of circumstances surrounding the conduct, such as the defendant's course of conduct, the context of the parties' relationship, whether the defendant knew the plaintiff was particularly susceptible to emotional distress, and the defendant's motive or intent." *MVS Int'l Corp. v. Int'l Advert. Sols LLC*, 545 S.W.3d 180, 204 (Tex. App. 2017). "If reasonable minds could differ on whether the acts in question . . . were so extreme and outrageous as to go beyond all possible bounds of decency and were atrocious and utterly intolerable in a civilized community," then the issue must be submitted to the trier of fact. *Motsenbocker v. Potts*, 863 S.W.2d 126, 133 (Tex. App. 1993) (holding that increase in plaintiff's health insurance deductible from $300 to $50,000 after employer learned plaintiff had terminal cancer presents triable IIED claim).

As many courts across the country have recognized, the conduct alleged here more than satisfies this requirement.[98] Officials designed the Family Separation

---

[98]   *See, e.g.*, *Ms. L.*, 310 F. Supp. 3d at 1145 (finding the alleged practices "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"); *A.I.I.L.*, 2022 WL 992543 at *7 ("[A] jury could find the government's

Policy to terrorize children and gut their parents so that other Central American families would not come to the United States.  BYCC/G Compl. ¶¶ 19, 65, 179–81.  Executive officials set the Policy in motion knowing that the relevant agencies lacked systems for tracking and reuniting the separated families.  *Id.* ¶¶ 4, 37, 42, 49, 58.  Plaintiffs were migrants fleeing life-threatening persecution and seeking refuge in the United States.  BYCC Compl. ¶¶ 92, 222; RJP Compl. ¶¶ 83, 244.  As such, they were particularly susceptible to emotional distress and Defendant knew as much.  BYCC Compl. ¶¶ 60–65; RJP Compl. ¶¶ 61–66.  Indeed, the purpose of the Family Separation Policy was to cause severe emotional distress.  BYCC/G Compl. ¶ 179.

Defendant also argues that Plaintiffs' IIED claim fails because Texas prohibits "a person convicted of a crime from suing another for damages caused by the conviction."  Def.'s BYCC/G-Br. at 40–41 (citing *Jones v. Hyman*, 107 S.W.3d 830, 831032 (Tex. App. 2003)).  But Plaintiffs are not suing the Government "for damages caused by [a] conviction."  Beatriz was not convicted of a crime, nor could she have been.  BYCC Compl. ¶¶ 5, 54.  Rafael challenges neither the Government's decision to refer him for prosecution nor his misdemeanor conviction.  He challenges CBP's engineering of a prolonged separation by transporting him and Orlan to facilities a thousand miles apart *after* Rafael had been released from criminal custody.  RJP Compl. ¶ 106.

---

conduct extreme and outrageous and that such emotional distress resulted from the government's conduct."); *D.A.*, 2023 WL 2619167, at *16 (holding that plaintiffs plausibly stated a claim for IIED); *A.F.P.*, 2022 WL 2704570, at *10 (same).

As to the remaining elements of the IIED claim, Plaintiffs have more than sufficiently pled that Plaintiffs' emotional distress was "the intended or primary consequence of the defendant's conduct." *Espinosa v. Aaron's Rents, Inc.*, 484 S.W.3d 533, 545 (Tex. App. 2016); BYCC Compl. ¶¶ 60–65; RJP Compl. ¶¶ 61–66.  And the Complaints plausibly allege that the misconduct of federal employees is what caused Plaintiffs' severe emotional distress, including "fright, horror, grief, shame, humiliation, and worry." *Cunningham v. Waymire*, 612 S.W.3d 47, 65 (Tex. Ct. App. 2019) (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999)); BYCC Compl. ¶¶ 101–02, 112–13, 115 148–58; RJP Compl. ¶¶ 92–96, 103, 110, 119, 123, 148, 155–72, 223–24.  For these reasons, several district courts applying Texas law in other family separation cases, including those in which an adult was prosecuted for illegal entry, have allowed IIED claims to proceed past the pleading stage.  *E.g.*, *D.A.*, 2023 WL 2619167, at 36; *A.F.P.*, 2022 WL 2704570, at 17–18.

### b. Negligence, negligent undertaking, and breach of fiduciary duty

Plaintiffs adequately pled negligence, negligent undertaking, and breach of fiduciary duty under Texas law.  A plaintiff bringing a claim for negligence must show: (1) a legal duty; (2) a breach of that duty; and (3) damage proximately caused by the breach.  *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App. 2012).  To establish a claim of negligent undertaking, a plaintiff must show that: (1) a defendant undertook to perform services that it should have known were necessary for the protection of the plaintiffs; (2) defendant failed to exercise reasonable care in performing those services; (3) plaintiff relied upon defendant's performance; or (4)

-76-

defendant's performance increased plaintiff's risk of harm.  *Kristensen v. United States*, 372 F. Supp. 3d 461, 469 (W.D. Tex. 2019).  A plaintiff asserting a breach of fiduciary duty must establish a fiduciary relationship.  *Plotkin v. Joekel*, 304 S.W.3d 455, 479 (Tex. App. 2009).

> i.   *Defendant owed a duty to Plaintiffs.*

Each of these claims rests on different iterations of the duty the defendant owes to the plaintiff.  Whether a defendant owes a duty in the first place requires the court "to balance a number of factors."  *Tex. Home Mgmt., Inc. v. Peavy,* 89 S.W.3d 30, 33 (Tex. 2002).  "Although the formulation and emphasis var[y] with the facts of each case, three categories of factors have emerged: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy considerations."  *Id.* at 33–34.  "The existence of a duty is a question of law when all of the essential facts are undisputed, but when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury."  *Helbing v. Hunt*, 402 S.W.3d 699, 703 (Tex. App. 2012) (quoting *Mitchell v. Missouri-Kansas-Texas R. Co.*, 786 S.W.2d 659, 662 (Tex. 1990), *overruled on other grounds*, *Union Pac. R. Co. v. Williams*, 85 S.W.3d 162 (Tex. 2002)).

The Supreme Court of Texas has recognized "that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation."  *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000); *see also* Restatement (Second) of Torts §§ 232, 324A.  "Of all the[] factors" relevant to assessing whether an undertaking gives rise to a duty, "foreseeability of

the risk is the foremost and dominant consideration." *Davis v. Dallas Cnty., Tex.,* 541 F. Supp. 2d 844, 850 (N.D. Tex. 2008) (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)).

"[A] special relationship may [also] give rise to the duty to aid or protect." *Howell v. City Towing Assocs., Inc.*, 717 S.W.2d 729, 733 (Tex. App. 1986); *Tex. Home Mgmt.,* 89 S.W.3d at 34–36 (mental health facility had "right to control" its residents, which created a "special relationship" giving rise to a duty to supervise them). Similarly, "[a]n informal fiduciary relationship . . . may arise in the context of informal moral, social, domestic, or personal relationships in which one person trusts and relies on another." *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 544 (S.D. Tex. 2011); *see also D.A.*, 2023 WL 2619167, at *18 (rejecting Government's argument that court did not have subject matter jurisdiction over plaintiff's breach of fiduciary duty claim, among others).

Here, the duty arose when CBP officers took Plaintiffs into custody and assumed control over them. Texas courts have imposed duties of care on individuals and/or entities that assume custody and control of others. *See*, *e.g.*, *Applebaum v. Nemon*, 678 S.W.2d 533, 535–36 (Tex. App. 1984) (holding that day care facility agreement to protect child from harm created a special relationship triggering the duty to aid child who died on playground equipment while in day care's custody); *Helbing*, 402 S.W.3d at 701 (holding that jury could find that defendant college mentors breached a duty of care when they invited plaintiff and other freshmen on a hiking trip and purported to give a "safety briefing," thereby "undert[aking] to

perform a service," before plaintiff was injured); *see also Kristensen*, 372 F. Supp. 3d at 469 (holding that representatives of those shot and killed by Army serviceman brought viable FTCA action against Government for breach of Army's duty to protect serviceman's wife after she reported he threatened to kill her and they undertook to provide assistance).

Relying on Texas jurisprudence, federal courts in family separation cases have found a private analog for negligence claims under the FTCA because "[f]ederal immigration officials, like employees at a private facility for the mentally impaired tasked with the care and custody of facility residents, also have a 'special relationship' with detainees in that they are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care." *A.F.P.*, 2022 WL 2704570, at *10 (quoting *C.M.*, 2020 WL 1698191, at *2); *accord I.T.*, No. 22-cv-05333, slip op. at 14.[99] Defendant owed a duty to Plaintiffs under Texas law.

### ii.    *Defendant breached its duty to Plaintiffs.*

Defendant argues there was no breach because Rafael was criminally prosecuted for a misdemeanor charge of illegal entry, Def.'s RJP Br. at 42, and Beatriz

---

[99]    In *C.D.A.*, 2023 WL 2666064, at *24, the court dismissed a negligence claim for failure to identify a legal duty because the "special duty between an inmate and a jailor" found in *Salazar v. Collins*, 255 S.W.3d 191, 200 (Tex. App. 2008), was inapplicable to the factual allegations.  Although *Salazar* arises in a public rather than private-person context, Plaintiffs believe it lends support, and at least one federal district court applying Texas law has relied on *Salazar* to find a special relationship between similarly situated plaintiffs and Defendant.  *A.F.P.*, 2022 WL 2704570, at *10.  In any event, Plaintiffs rely on additional theories to demonstrate the requisite duty.  *See, e.g.*, *Applebaum*, 678 S.W.2d at 535–36; *Helbing*, 402 S.W.3d at 701.

was detained "for potential criminal prosecution," Def.'s BYCC Br. at 42.  According to Defendant, as a consequence of that detention and/or prosecution, their children were separated from them.  Def.'s RJP Br. at 42; Def.'s BYCC Br. at 42.  But Plaintiffs do not challenge their apprehension, detention, and/or prosecution (nor could Beatriz have been prosecuted).  Instead, they challenge their forcible separation and the Government's denial of information, obstruction of communication, and recklessness with regard to reunification.  Their apprehension, detention, and/or prosecution did not necessitate any of these harms.  The Government apprehended and detained families without conducting mass, indiscriminate separations for decades before launching the Policy challenged here.  BYCC/G Compl. ¶ 22 & n.4.  Moreover, Plaintiffs' detailed allegations of Defendant's violation of the United States Constitution, federal law, the *Flores* Agreement, and binding agency standards at minimum support their claims of a breach of duty.  BYCC/G Compl. ¶¶ 168–211.

### iii.    *The harm was foreseeable.*

As to foreseeability, the Complaints allege that the harm of family separation was not only foreseeable but foreseen and intended.  BYCC/G Compl. ¶¶ 60–65. "Indeed, harming children was *the point* of this alleged conduct—to deter other families from crossing the southern border." *K.O.*, 2023 WL 131411, at *9 (D. Mass. Jan. 9, 2023); *see also D.J.C.V.*, 605 F. Supp. 3d 571, 596 (S.D.N.Y. 2022).

### iv.    *Plaintiffs have sufficiently pled damages.*

Defendant also argues that Plaintiffs are not permitted to recover for purely emotional damages under Texas Law.  This is wrong.  *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 442–44 (Tex. 1995) (detailing history of mental anguish damages in

Texas and noting that Texas has had no requirement of physical injury or manifestation since 1987). Texas allows "mental anguish damages" for negligence-based claims where (1) "they are the foreseeable result of a breach of duty arising from some special relationship," or (2) they involve "'injuries of such a shocking and disturbing nature that mental anguish is a highly foreseeable result.'" *Fitzpatrick v. Copeland*, 80 S.W.3d 297, 303 (Tex. App. 2002); *accord City of Tyler v. Likes,* 962 S.W.2d 489, 495–96 (Tex. 1997).

The Government cites *Villafuerte v. United States*, No. 16-CV-619, 2017 WL 8793751 (S.D. Tex. Oct. 11, 2017), to support its argument that Texas law requires physical injury to sustain a negligence and negligent undertaking claim. But that case simply recites the black letter law in Texas foreclosing recovery for emotional damages *unless* there is a valid basis, "such as when there is *a special relationship* between the parties." *Id.* at *11 (emphasis added). Here, Plaintiffs are entitled to emotional damages under Texas law because they have plausibly pled the existence of a special relationship. BYCC Compl. ¶¶ 222, 229, 236; RJP Compl. ¶¶ 244, 251, 258. Plaintiffs are also entitled to emotional damages because their claims involve "injuries of such a shocking and disturbing nature that mental anguish is a highly foreseeable result." *See D.A.*, 2023 WL 2619167, at *9 ("[T]he staggering backlash that the Trump Administration received following implementation of its Zero Tolerance Policy—which caused that administration to retract the policy after little over two months—evinces the conscience-shocking nature of its forced family

separations."); *see also Silcott v. Oglesby,* 721 S.W.2d 290, 292 (Tex. 1986) (upholding emotional damages in kidnapping case).

Even if it were true that Texas law does not recognize purely emotional damages, which it does, Plaintiffs have also pled physical manifestations of their profound trauma, which entitle them to recover emotional damages under Texas law. *Likes,* 962 S.W.2d at 495–96; *see also, e.g.*, BYCC Compl. ¶¶ 96 n.115, 101–105, 107–113, 115–116, 118–120, 122–123, 125, 127–128, 130, 132, 144–158; RJP Compl. ¶¶ 155–156, 159–162.

### c.    Negligent supervision

The tort of negligent supervision imposes liability if: (1) an employer had a duty to supervise competent employees; (2) the employer breached that duty; and (3) the breach proximately caused the plaintiffs' injuries.  *THI of Texas at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 573 (Tex. App. 2010).  The plaintiff must also establish that the employee committed an actionable tort against the plaintiff.  *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 800 n.2 (Tex. 2010).

The duty requirement for negligent supervision mirrors that for a negligence claim.  *Holcombe v. United States*, 388 F. Supp. 3d 777, 806 (W.D. Tex. 2019) (motion to dismiss), No. 18-CV-555, 2021 WL 67217, at *19 (W.D. Tex. Jan. 6, 2021) (summary judgment).  "Generally, the employer-employee relationship creates a duty on the part of the employer to control the employee's conduct."  *Mackey v. U.P. Enterprises, Inc.*, 935 S.W.2d 446, 459 (Tex. App. 1996) (citing *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)).  This duty is heightened when the "employee will have special access to a particularly vulnerable group."  *Doe v. YUM! Brands, Inc.*,

639 S.W.3d 214, 227 (Tex. App. 2021) (noting heightened supervisory duty with respect to door-to-door salespeople, drug and alcohol abuse treatment counselors, and persons involved in care of elderly).   Thus, "an employer is liable for negligent hiring, retention, or supervision if it hires an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others."  *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App. 2008).

Defendant contends that Plaintiffs' pleadings fall short of alleging its precise supervisory failures.   Def.'s BYCC/G-Br. at 46–47.   Details regarding Defendant's breaches can be known only after discovery is underway.   *Holcombe*, 388 F. Supp. 3d at 806 (holding that plaintiffs' claim against the Government for negligent supervision of federal employees who allegedly failed to collect, handle, and report required background information in connection with the purchase of firearms used in a mass shooting are "better addressed at summary judgment or trial, as discovery will reveal whether Plaintiffs meet the necessary elements").

Plaintiffs have pled sufficient "factual content that allows the court to draw the reasonable inference" that federal employees failed to supervise those responsible for the tortious conduct.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Neither the separations Plaintiffs describe nor the inhumanity with which CBP officers executed them were unique.   Government reports confirm the scope of the misconduct, BYCC/G

-83-

Compl. ¶¶ 19–80, and complaints filed around the country reflect similar abuses.[100] Plaintiffs attribute this widespread misconduct to policies officials put in place aimed at causing harm.  BYCC/G Compl. ¶¶ 60–65.  If that is not a perversion of supervisory authority and violation of a duty of care, it is hard to see what might be.

Defendant also argues that Plaintiffs' negligent supervision claim violates the principle that "Texas law does not allow an employer to be held both vicariously liable for an employee's negligence and directly liable for negligent . . . supervision."  Def.'s BYCC/G Br. at 46.  A Texas District Court has properly rejected this argument. *Holcombe*, 2021 WL 67217, at *29.  As the *Holcombe* court noted, "[a]ll FTCA liability is *respondeat superior* liability," *id.*, at *28, because the FTCA limits actionable torts to those committed by federal employees acting within the scope of their employment, 28 U.S.C. § 1346(b)(1).  Yet that does not preclude a claim for negligent supervision:

> The purpose of Plaintiffs' claim for negligent supervision is not to impute the liability of [the] agents to their supervisors, which the Court agrees would be a waste of judicial resources.  The purpose of the negligent supervision claim is just the opposite—to determine the amount of harm that can be independently attributed to [] leadership's failure to exercise reasonable care in supervising its agents.  Thus, Plaintiffs' claim for negligent supervision is not a "means to the same end" as *respondeat superior* liability.

*Holcombe*, 2021 WL 67217, at *28.  Because the United States is liable under the FTCA for the distinct torts of both line employees and their supervisors, Defendant's

---

[100]    *E.g.*, First Am. Compl., *Fuentes-Ortega*, No. 22-cv-00449, ¶¶ 73–74 (D. Ariz. Apr. 22, 2022), ECF No. 17; First Am. Compl., *K.O.*, No. 20-cv-12015, ¶¶ 139, 148, 152 (D. Mass. Apr. 11, 2022), ECF No. 41; Compl., *Wilbur P.G.*, No. 21-cv-04457, ¶¶ 69, 83, 85, 95, 105, 184 (N.D. Cal. June 10, 2021), ECF No. 1; Compl., *I.T.*, No. 22-cv-05333 ¶¶ 68, 102, 115, 118, 134 (N.D. Cal. Sept. 20, 2022), ECF No. 1.

objection fails.  *See K.O.*, 2023 WL 131411, at *12 (negligent supervision claim based on assault and battery by immigration officers survived motion to dismiss).

Finally, Plaintiffs have shown that Defendant's employees have committed actionable torts against them.  *See generally* Point II.B.2.  Therefore, Plaintiffs' claims for negligent supervision under Texas law survive.

### d.   Child abduction

Texas recognizes child abduction in violation of a custody order as a tort under its common law.  *See Silcott v. Oglesby,* 721 S.W.2d 290, 292–93 (Tex. 1986) (quoting Restatement (Second) of Torts § 700[101]; Tex. Fam. Code Ann. § 42.002(a). Texas case law also supports such a claim outside the custodial interference context, such as in the circumstances presented here.

Several district courts, including in a recent decision from the Western District of Texas, have relied on *Silcott* to support a cause of action for interference with the parent-child relationship.  *E.g., D.A.*, 2023 WL 2619167, at *10 & n.134 ("Texas courts recognize a tort cause of action for interruption of the parent-child relationship when someone abducts, entices away, or harbors a parent's minor child." (citing *Silcott*, 721 S.W.2d at 292)); *see also K.O.*, 2023 WL 131411, at *11 (citing *Silcott* to support holding that Texas "does recognize a cause of action when children are abducted from

---

[101]    In recognizing the tort of child abduction, the Supreme Court of Texas relied on the elements set forth in the Restatement: (1) an actor (2) with knowledge that the parent does not consent (3) either (a) abducts, takes, or retains possession of a minor child, (b) conceals the whereabouts of a minor child from a parent legally entitled to custody, (c) compels or induces a minor child to leave a parent legally entitled to its custody, or (d) compels or induces a minor child not to return to the parent after it has left him/her.  Restatement (Second) of Torts § 700.

their rightful custodian" (citations omitted)); *see also A.E.S.E.*, 2022 WL 4289930, at *14 (rejecting motion to dismiss where plaintiffs alleged Government's forced separation and interference with parent-child relationship supported IIED claim).

Plaintiffs have pled that CBP officers removed Manuel and Orlan from their parents' care and custody without their parents' consent and without legal authority to do so.   BYCC Compl. ¶¶ 238–244; RJP Compl. ¶¶ 260–266.   Plaintiffs have adequately pled a claim for child abduction.

### e.    Abuse of process

Under Texas law, "[a]buse of process is the malicious use or misapplication of process in order to accomplish an ulterior purpose." *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001).   To show abuse of process, a plaintiff must allege "(1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process, (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of process; and (3) damage resulted to the plaintiff as a result of such illegal act." *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App. 2018); *D.A.*, 2023 WL 2619167, at *17.   Plaintiffs Beatriz and Manuel satisfy each element.

"An action for abuse of process presupposes an originally valid and regular process, duly and properly issued." *Tandy Corp. v. McGregor*, 527 S.W.2d 246, 249 (Tex. App. 1975); *see also Blackstock v. Tatum*, 396 S.W.2d 463, 467–68 (Tex. App. 1965).   The term "process" encompasses a broad range of procedures incident to civil and criminal proceedings. *Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex. App. 1979); *Kjellvander v. Citicorp*, 156 F.R.D. 138, 142 (S.D. Tex. 1994).

The Government's detention of Beatriz and Manuel, and the institution of removal proceedings against them, constitute process. *See Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781, 816 (Tex. App. 2017) (finding that process commences with "the issuance of an arrest warrant or a lawful arrest"). Beatriz and Manuel do not contest that Defendant had the authority to enforce the immigration laws against them in this way. The initiation of process was therefore lawful.

The "illegal, improper, or perverted use of the process," *Moore*, 559 S.W.3d at 653, occurred when CBP officers designated Manuel as an "unaccompanied alien child," even though he was detained with his mother and she was available to care for him. BYCC Compl. ¶¶ 55, 92–99. This designation changed the process by which the Government would seek to establish immigration violations, including by subjecting Manuel to immigration proceedings independent of his mother's. 8 U.S.C. § 1232(a)(5)(D). This severance of mother and son constituted an abuse of process.

Moreover, the Complaint documents the next element—"the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of process." Plaintiffs allege that the Government misused the UAC designation for the ulterior purpose of separating Beatriz and Manuel, detaining them in facilities thousands of miles apart, traumatizing them, and deterring other Central American families from seeking humanitarian relief, in part because of ethnic and racial animus towards this group. BYCC/G Compl. ¶¶ 29, 39, 40, 55, 60, 63, 64, 182, 189; *see also A.F.P.,* 2022 WL 2704570, at *10 (upholding abuse of process claim where plaintiffs alleged "defendant maliciously used plaintiff A.F.P's prosecution for illegal

entry as a pretext for separating him from his minor son in pursuit of an ulterior purpose of deterring other asylum seekers from entering the United States"); *D.A.*, 2023 WL 2619167, at *17 (same, and noting "discriminatory animus"). The "collateral advantage" sought here—the one "not properly involved in the proceeding itself"— was to stop the influx of unwanted immigrants. Def.'s BYCC Br. at 52 (quoting *Blackstock*, 396 S.W.2d at 468).

The damages Plaintiffs allege flowed directly from the unlawful designation and separation. BYCC Compl. ¶¶ 147–158. Beatriz and Manuel therefore adequately plead their abuse of process claim.[102]

### f.    Assault and battery

In Texas, assault and battery are combined under the offense of "assault." Tex. Pen. Code § 22.01(a); *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014).

> A person commits assault under the Texas Penal Code if the person intentionally, knowingly, or recklessly causes bodily injury to another, intentionally or knowingly threatens another with imminent bodily injury, or intentionally or knowingly causes physical contact when the person knows or should reasonably believe the other will regard such contact as offensive or provocative.

*Culver v. Culver*, 360 S.W.3d 526, 533 (Tex. App. 2011) (citing Tex. Pen. Code. § 22.01). The elements for assault are the same in civil and criminal cases. *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012).

Defendant argues that it was privileged under Texas Law to assault Plaintiffs by grabbing Manuel from Beatriz's lap. Def.'s BYCC Br. at 54–55. Specifically,

---

[102]    Rafael and Manuel reserve the right to amend their Complaint to add this claim.

Defendant claims it is entitled to the protections of Texas Penal Code § 9.51(a), which provides that a peace officer "is justified in using force when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making arrest." *Id.* But federal agents were not making an arrest when they took Manuel; they were illegally separating a family already in custody. BYCC Compl. ¶¶ 5, 100–06, 251–56. In any event, such state law privileges are not available to the United States in an FTCA action. *Supra* Point II.B.1. Thus, state law privileges do not immunize Defendant from liability, and Plaintiffs' assault claim survives.

## C. The Allegations in the JALC Complaint Support Liability Under Michigan Law.

### 1. The Court should apply Michigan law to Jacob and Leya's claims.

The Parties agree on the applicable choice-of-law analysis; it is the facts they see differently. In a multistate tort action, the FTCA requires a court to apply the "whole law" of the place where the acts or omissions (not the injury) occurred, including its choice-of-law rules. *Richards v. United States*, 369 U.S. 1, 11 (1962); *see also* 28 U.S.C. § 1346(b)(1).

The Third Circuit begins a choice-of-law analysis by considering "whether there exists a 'true conflict'" between the choice-of-law rules of the relevant states. *Simon v. United States*, 341 F.3d 193, 200 (3d Cir. 2003) (citing *Gould Elecs.*, 220 F.3d at 179, 181). Here, Michigan and Texas choice-of-law rules conflict. Michigan applies its own law unless there is "a 'rational reason' to do otherwise." *Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997). Texas applies the "'most significant relationship' test" detailed in the Restatement (Second) of

Conflict of Laws. *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (citing Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. L. Inst. 1971)). The Third Circuit resolves this choice-of-law conflict by applying the law of the state where the last significant act or omission occurred. *Simon*, 341 F.3d at 204.

The last significant act occurred in Michigan in the form of the mishandled reunification of Jacob and Leya. It was in Michigan that ICE officers mistakenly asserted that Jacob had agreed to voluntary departure. JALC Compl. ¶ 119. It was in Michigan that ICE agents failed to inform Jacob of the paperwork needed to proceed with release and reunification. *Id.* It was in Michigan that immigration officers arranged for a video call between Jacob and Leya only to produce a small boy who was looking for his father. *Id.* ¶ 120. Defendant discounts these events as insignificant. Def.'s JALC Br. at 38. But they were not insignificant to Jacob. Nor were the three months Leya spent in Michigan in ORR custody, without any communication with her father until his lawyers arranged a call on day seventy-four of the separation, insignificant to her. JALC Compl. ¶¶ 104–116. Thus, the last significant acts giving rise to the causes of action asserted in the Complaint took place in Michigan, and Michigan choice-of-law rules govern. *See S.E.B.M.*, 2023 WL 2383784, at *5 (applying Third Circuit's "last significant act" rule to conclude that Texas law controlled as that is where child was detained after an initial separation in New Mexico).[103]

---

[103]    If the Court believes that determination of where the last significant event occurred requires further fact-finding, the choice-of-law analysis may be deferred to a post-discovery phase of the litigation. *C.D.A.*, 2023 WL 2666064 at *21 (postponing

Michigan courts use a two-step analysis to identify a rational basis for displacing Michigan law. *Sutherland*, 562 N.W.2d at 471. The first prong requires an examination of whether "any foreign state has an interest in having its law applied." *Id.* at 472. "If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* If a foreign state has an interest in having its law applied, the court proceeds to the second prong and determines "if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* (citing *Olmstead v. Anderson*, 400 N.W.2d 292, 302, 304–05 (Mich. 1987)).

The first prong is dispositive here. Texas has no interest in having its law apply. While the initial separation occurred in Texas, Texas as a state had nothing to do with the Family Separation Policy or its implementation. The alleged wrongdoers here are all federal employees, not employees of any Texas entity. Nor do Plaintiffs have meaningful connections to Texas. Leya was there for less than forty-eight hours. JALC Compl. ¶¶ 82, 104. Jacob was there for approximately three weeks of his three months in detention. *Id.* ¶ 100. Both now reside in New Jersey. *Id.* ¶¶ 9, 10. Because Texas has no legal interest in this matter, Michigan courts would apply Michigan's substantive law. *Sutherland*, 562 N.W.2d at 471–72.

---

choice-of-law analysis in family separation case); *see also Harper v. LG Elecs. U.S.A., Inc.*, 595 F. Supp. 2d 486, 490–91 (D.N.J. 2009) (postponing choice-of-law determination at motion to dismiss stage because the Court was "unable to make the fact-intensive choice-of-law determination on the record before it"); *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011). If the court considers the choice-of-law analysis premature, the claims in the JALC Complaint should survive this motion if they are "sufficient within [either] of [the relevant] states." *C.D.A.*, 2023 WL 2666064, at *21. In that instance, the Court should consider the arguments under both Michigan and Texas law as they apply to Jacob and Leya.

Moreover, even if the Michigan courts were to reach the second prong of the choice-of-law analysis, Michigan law would prevail. To determine whether Michigan law applies despite another state's interests, Michigan courts consider a non-exhaustive list of factors. *Humphries v. Allstate Ins. Co.*, No. 18-cv-11006, 2020 WL 3248896, at *9 (E.D. Mich. June 16, 2020) (listing factors). Of these, the first—whether the injury occurred in the state whose law the party seeks to apply—is the most important here. *See Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 698 (6th Cir. 2013) (explaining that Michigan courts have treated the place of injury as a "significant factor" in Michigan choice-of-law analysis). Under Michigan law, the place where the injury occurred is "the state where the last event necessary to make an actor liable for an alleged tort takes place." *Sexton v. Ryder Truck Rental, Inc.*, 320 N.W.2d 843, 848 (Mich. 1982) (quoting Restatement (First) of Conflict of Laws § 377 (Am. L. Inst. 1934)). As explained above, the last events giving rise to liability took place in Michigan.

The other factors are largely irrelevant, and none is sufficient to overcome the primary factors that favor the application of Michigan law.

### 2. The allegations support each of the Michigan torts pled.

#### a. Intentional infliction of emotional distress

Plaintiffs' claim for intentional infliction of emotional distress (IIED) survives under Michigan law. The elements in Michigan are the same as those in Texas. *Compare Lucas v. Awaad*, 830 N.W.2d 141, 150 (Mich. Ct. App. 2013), *with Twyman*, 855 S.W.2d at 620. And the JALC Complaint supports each of these elements. The conduct of the officials who formulated, launched, and implemented the Family

Separation Policy was "utterly intolerable in a civilized community." *Id.*; JALC Compl. ¶¶ 59–80. Defendant "specifically intended to cause a plaintiff emotional distress" or "was so reckless that 'any reasonable person would know emotional distress would result.'" *Lewis v. LeGrow,* 670 N.W.2d 675, 689 (Mich. Ct. App. 2003) (citation omitted); JALC Compl. ¶¶ 59–64. And the misconduct of federal employees caused Plaintiffs' severe emotional distress, including "mental suffering, mental anguish, mental or nervous shock, or the like." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 911 (Mich. 1985) (quoting Restatement (Second) of Torts § 46, cmt. j); JALC Compl. ¶¶ 93–111, 120, 128–136.

Defendant's assertions notwithstanding, Michigan's state law immunities are no more applicable than Texas's. *Supra* Point II.B.1. And even if such immunities were available, Michigan law forecloses them here. In a case clarifying the test for governmental immunity, the Michigan Supreme Court reaffirmed that an officer sacrifices immunity for intentional torts if he acts with "malice or wantonness or a reckless indifference to the common dictates of humanity." *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 225 (Mich. 2008) (emphasis omitted) (quoting *Firestone v. Rice*, 38 N.W. 885, 888 (Mich. 1888)).[104] The launch and execution of the Family Separation Policy are a case study in "reckless indifference to the common dictates of humanity." *Odom*, 760 N.W.2d at 225; JALC Compl. ¶¶ 19–80.

---

[104]    Defendant cites an earlier case that states a slightly different test, Def.'s JALC Br. at 42 n.14 (citing *Wilson v. City of Detroit*, No. 271522, 2007 WL 677739 (Mich. Ct. App. Mar. 6, 2007)), but *Odom* is the controlling authority on governmental immunity in Michigan.

### b.   Negligent infliction of emotional distress

Michigan law recognizes negligent infliction of emotional distress (NIED) when a parent "witnesses the negligent infliction of injury to his or her child and suffers emotional distress as a consequence." *Wargelin v. Sisters of Mercy Health Corp.*, 385 N.W.2d 732, 734 (Mich. Ct. App. 1986). To establish a prima facie case of NIED, a plaintiff must present evidence that: (1) "the injury threatened or inflicted on the third person" was serious enough "to cause severe mental disturbance to the plaintiff"; (2) the shock resulted in physical harm; (3) the plaintiff is a member of the immediate family; and (4) the plaintiff was present at the time of the accident. *Id.* at 735 (citation omitted).

The Complaint pleads facts to support each of these elements. The separation seriously harmed Leya, and the resulting shock to Jacob caused him physical harm, including persistent piercing headaches, insomnia, loss of appetite and accompanying weight loss, and extreme fear and anxiety. JALC Compl. ¶¶ 88–96, 102, 112, 133–136. These harms were "the [n]atural result of the fright proximately caused by defendant's conduct." *Daley v. LaCroix*, 179 N.W.2d 390, 395 (Mich. 1970). And the physical symptoms Jacob pleads meet Michigan's threshold for compensable injury. *Id.* at 396 (holding that plaintiff's "sudden loss of weight, her inability to perform ordinary household duties, her extreme nervousness and irritability" constituted facts sufficient to go to a jury); *Toms v. McConnell*, 207 N.W.2d 140, 145 (Mich. Ct. App. 1973) (holding that mother who saw her daughter killed in a car accident sufficiently pled physical injury by alleging her withdrawal from "normal forms of socialization" and "her continued state of depression").

-94-

### c.   Negligence, negligent undertaking, and breach of fiduciary duty

Plaintiffs adequately pled negligence, negligent undertaking, and breach of fiduciary duty under Michigan law.  Again, there is considerable overlap between Michigan and Texas law.  *See Doe v. Roman Cath. Archbishop of Archdiocese of Detroit*, 692 N.W.2d 398, 405 (Mich. Ct. App. 2004) (elements of negligence are (1) a duty,[105] (2) breach of that duty, (3) causation, and (4) damages); *Schanz v. New Hampshire Ins. Co.*, 418 N.W.2d 478, 481 (Mich. Ct. App. 1988) (an undertaking to render services, whether gratuitously or for consideration, gives rise to a legal duty when a person "should recognize [the services] as necessary for the protection of the other's person or things" (quoting Restatement (Second) of Torts § 323)); *Calhoun Cnty. v. Blue Cross Blue Shield Michigan*, 824 N.W.2d 202, 213 (Mich. Ct. App. 2012) (plaintiff must establish fiduciary relationship before showing breach of such duty).

Like most states, Michigan imposes duties of care on individuals who assume custody and control of others.  In *Bryant v. Oakpointe Villa Nursing Center*, for example, the Michigan Supreme Court sustained a claim of negligence against a nursing home whose staff had discovered an incapacitated resident tangled in her bed sheets and did nothing to rectify this, resulting in the resident's asphyxiation. 684 N.W.2d 864, 875–76 (Mich. 2004).  In *Mayberry v. Pryor*, the Court held that

---

[105]   Whether a defendant owes a duty is "a question of law that must be decided by the court after 'assessing the competing policy considerations for and against recognizing the asserted duty.'"  *Roberts v. Salmi*, 866 N.W.2d 460, 465 (Mich. Ct. App. 2014) (citation omitted).  The most important factors are the relationship between the parties and the foreseeability of the harm.  *Hill v. Sears Roebuck & Co.*, 822 N.W.2d 190, 196 (Mich. 2012).

children could sue foster parents for harms they caused, and that foster parents are not entitled to the immunity biological and adoptive parents enjoy.  374 N.W.2d 683, 689 (Mich. 1985).  And still instructive though not in a private-person setting, the Michigan courts recognize that jails owe elevated duties of care to pretrial detainees. *People v. Bland*, 218 N.W.2d 56, 60 (Mich. Ct. App. 1974).

The relationship of custodian and dependent also underlies the more particular negligence claims pled here.  A fiduciary duty arises "when one person assumes control and responsibility over another," giving rise to "the highest duty of care." *Calhoun Cnty.*, 824 N.W.2d at 213.  In addition, CBP officers exposed themselves and others to a claim of "negligent undertaking," having obligated themselves to "render services"—such as providing shelter and sustenance and preventing harm—which they should have "recognize[d] as necessary for [Plaintiffs'] protection." *Schanz*, 418 N.W.2d at 481.

The harms of family separation were not merely foreseeable but intentional. JALC Compl. ¶¶ 59–64.  And Defendant cannot sidestep liability by arguing that the separation resulted from Jacob's detention.  Def.'s JALC Br. at 45 n.16.  Plaintiffs' lawful apprehension and detention cannot justify their unlawful separation.

### d.    Child abduction

The Supreme Court of Michigan has held that "[o]ne who, without a privilege to do so, abducts a minor child . . . is liable to the parent, who is legally entitled to the child's custody." *Brown v. Brown*, 61 N.W.2d 656, 659 (Mich. 1953) (quoting Restatement (First) of Torts § 700 (Am. L. Inst. 1934)); *see also Burkhardt v.*

*Burkhardt*, 282 N.W. 231, 234 (Mich. 1938).  The parent can recover "for the loss of society of his child and for the emotional distress resulting from the abduction."  *Id.*

Yet again, Defendant argues that Leya was not abducted but was "separated from [Jacob] due to his lawful detainment."  Def.'s JALC Br. at 48 n.19.  But detention does not necessitate separation.  *See, e.g.*, *C.D.A.*, 2023 WL 2666064, at *1 (noting that father and child were reunified in a family detention center).

Insofar as Defendant means to claim a "privilege" to have taken Leya, this argument also fails.  In Michigan, an official who *improperly* removes a child from a parent is liable for child abduction.  *Oversmith v. Lake*, 295 N.W. 339, 341 (Mich. 1940) (upholding tort recovery for child abduction when local official removed children based on an allegation of neglect without having complied with legal notice requirement).  Here, too, the CBP officers removed Leya without legal authority to do so.  *Supra* Point I.B.

### e.    Abuse of process

In Michigan as in Texas, "[t]o recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding."  *Friedman v. Dozorc*, 312 N.W.2d 585, 594 (Mich. 1981).  A plaintiff must show "'the improper use of process after it has been issued, not for maliciously causing it to issue.'"  *Lawrence v. Burdi*, 886 N.W.2d 748, 754 (Mich. Ct. App. 2016).

Plaintiffs plausibly alleged: (1) the Government lawfully initiated the "legal process" of enforcing its immigration laws when it apprehended Jacob and Leya and instituted removal proceedings against them; (2) it misused its authority by

designating Leya as an "unaccompanied alien child" and separating her from Jacob without lawful authority; and (3) it effectuated this separation for the improper purpose of causing harm and deterring the migration of other Central American families.  JALC Compl. ¶¶ 234–240.

### f.    Assault and Battery

Plaintiffs have sufficiently pled assault and battery.  An assault is the threatened use of force, "under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991) (citation omitted).  Battery is the "wilful [sic] and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.*  A battery need not cause an injury. *Lakin v. Rund*, 896 N.W.2d 76, 78 (Mich. Ct. App. 2016) (citation omitted).

The Complaint alleges that CBP agents committed these torts when male officers searched Leya while female officers stood nearby, in violation of governing professional standards.   TEDS § 5.5; JALC Compl.  ¶¶ 83, 84, 190, 243.   The Complaint alleges further that CBP officers committed these torts when they grabbed Leya, pulled her out of Jacob's arms, and carried her away. *Id.* ¶¶ 88, 243–244.

Defendant again tries to hide behind inapplicable state law privileges, citing *Hart v. Danak* for the proposition that a police officer is immune from liability for good faith discretionary acts so long as the officer acts without wantonness or malice. Def.'s JALC Br. at 54 n.22 (citing *Hart*, No. 280975, 2010 WL 1404431, at *4–5 (Mich. Ct. App. Apr. 8, 2010)).  But the Complaint plausibly alleges that the CBP officers

involved in the separation acted with intentional cruelty, thereby sacrificing any privilege that might otherwise have been available under Michigan law. JALC Compl. ¶¶ 88–90; *Odom*, 760 N.W.2d at 225; *see also K.O.*, 2023 WL 131411, at *12 (upholding separated families' assault and battery claims under Michigan law).

### g. Loss of consortium

Defendant acknowledges that Michigan law permits a child to maintain an action for the "loss of a parent's society and companionship caused by tortious injury to the parent." Def.'s JALC Br. at 55 n.23 (citing *Berger v. Weber*, 303 N.W.2d 424, 427 (Mich. 1981)). The injury here was plausibly "tortious" because the causes of action under Michigan tort law survive. Despite Defendant's unsupported allegation, no Michigan court has limited recovery for loss of consortium to physical injury, and in any event, the physical injuries Plaintiffs pled are sufficient under Michigan law. *Daley*, 179 N.W.2d at 395; *Toms*, 207 N.W.2d at 145.

### CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Defendant's motions to dismiss in their entirety.

| | | |
|---|---|---|
| *s/ Natalie J. Kraner* | *s/ Catherine Weiss* | *s/ Jennifer Fiorica Delgado* |
| Natalie J. Kraner | Catherine Weiss | Jennifer Fiorica Delgado |
| Stephanie Ashley | Michelle L. Goldman | Wayne Fang |
| Logan Vickery | Amanda Sewanan | Markiana J. Julceus |
| *Pro Bono Counsel* | Pati Candelario | Raymond S. Cooper |
| for BYCC and MSCC | *Pro Bono Counsel* | *Pro Bono Counsel* |
| | for JALC and LLG | for RJP and ORJJ |

**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973-597-2500                                      May 2, 2023